PATAPSCO GUANO CO. *v.* BOARD OF AGRICULTURE OF NORTH CAROLINA.

*(Circuit Court, E. D. North Carolina. September 24, 1892.)*

1. CONSTITUTIONAL LAW—STATE INSPECTION LAWS.
    In the absence of any constitutional prohibition, a state has the right, under the general powers reserved from the grant of other powers to the federal government, and in the regulation of its internal commerce, and to protect its citizens from fraud, to say that certain articles shall not be sold within its limits without inspection, and also to charge the cost of such inspection upon those offering such articles for sale.

2. SAME—INSPECTION TAX—POWERS OF FEDERAL COURTS.
    A state tonnage tax upon fertilizers to defray inspection expenses will not be declared unconstitutional, simply upon the ground of alleged excess, when such excess does not manifest a purpose to evade constitutional inhibitions; and a federal court will not go into the examination of the question, except for the purpose of deciding whether the tax is only colorably or ostensibly an inspection charge, or a charge of a kindred nature.

3. SAME—EXCESSIVE TAX.
    The tax of 25 cents per ton imposed upon fertilizers by Pub. Laws N. C. 1891, c. 9, (amending Code, § 2190,) to defray the expenses of inspection, is not in itself so unreasonable or excessive as to show a purpose to evade the inhibition of the federal constitution against the taxation of imports by the states.

**4. SAME—REPEAL OF STATUTE—REVIVAL OF PRIOR STATUTE.**

Acts N. C. 1885, c. 308, § 4, provided that the board of agriculture should apply to the maintenance of an industrial school such parts of its funds as were not needed for the regular work of the department, not to exceed $5,000 annually. Pub. Laws 1887, c. 410, § 6, (amending and re-enacting Code, § 2190,) imposed a privilege tax of $500 on each separate brand of fertilizer sold in the state, and, as a substitute for the act of 1885, provided that all the surplus arising from this tax should be turned over to such industrial school. In 1890 the act of 1887 was declared unconstitutional as imposing a burden on interstate commerce. 43 Fed. Rep. 609. Thereafter its objectionable features were repealed, and superseded by Pub. Laws 1891, c. 9, which imposes a charge of 25 cents per ton on fertilizers, "for the purpose of defraying the expenses connected with the inspection" thereof. *Held,* that the repeal of the act of 1887 did not revive the act of 1885, so as to appropriate $5,000 of the fertilizer tax to the support of such school, and thus show an intent by the legislature to raise money for that purpose, rather than for the declared purpose of defraying the expenses of inspection.

In Equity. Bill by the Patapsco Guano Company against the board of agriculture of North Carolina to perpetually enjoin the latter from enforcing against it the state inspection tax on fertilizers. Heard on motion to dissolve injunction. Motion granted, and bill dismissed.

*Thos. N. Hill* and *J. W. Hinsdale,* for complainant.

*Busbee & Busbee* and *Battle & Mordecai,* for defendant.

SEYMOUR, District Judge. This court, in the case of *American Fertilizing Co.* v. *Board of Agriculture,* reported in 43 Fed. Rep. 609, decided so much of section 2190 of the Code of North Carolina as imposed a privilege tax of $500 per annum on every manufacturer or other person importing any commercial fertilizer into the state, for each separate brand or quality, to be unconstitutional. The ensuing legislature repealed the section, and modified the entire legislation upon the subject of commercial fertilizers. This legislation is to be found in chapters 9 and 348, Pub. Laws 1891. Chapter 9, quoted in part, reads as follows:

"Section 1. That section 2190 of the Code shall be substituted by the following: 'For the purpose of defraying the expenses connected with the inspection of fertilizers and fertilizing materials in this state, there shall be a charge of twenty-five cents per ton on such fertilizers and fertilizing material for each fiscal year, which shall be paid before delivery to agents, dealers, or consumers in this state. * * * Each barrel, bag, or other package * * * shall have attached thereto a tag stating that all charges specified in this section have been paid. * * * Any person, corporation, or company who shall sell or offer for sale any such fertilizers contrary to the provisions above set forth shall be guilty of a misdemeanor. * * *'

"Sec. 2. Section 2191 of the Code shall be substituted by the following: 'Every bag, barrel, or other package of such fertilizers, * * * offered for sale in this state, shall have thereon plainly printed a label or stamp, a copy of which shall be filed with the commissioner of agriculture, together with a true and faithful sample of the fertilizer * * * which it is proposed to sell, at or before the delivery to agents, dealers, or consumers in this state. * * * Also, the chemical composition of the contents of each package, * * * together with the date of its analyzation, and that the requirements of the law have been complied with. * * *'"

"Sec. 4. Section 2193 of the Code shall be substituted by the following: 'Any merchant, etc., who shall sell or offer for sale any commercial fertilizer without such labels, etc., * * * shall be liable to a fine of ten dollars.

* * * Any agent of any railroad * * * who shall deliver any fertilizers in violation of this section shall be guilty of a misdemeanor.' "

Chapter 348, Pub. Laws 1891, amends the previous legislation of the state in regard to the establishment and maintenance of an industrial school.

By the act of 1885, (chapter 308, § 4,) it was enacted that the board of agriculture should apply to the establishment and maintenance of an industrial school such part of their funds as was not required to conduct the regular work of the department, not to exceed $5,000 annually. Chapter 410, Pub. Laws 1887, § 6, provided that the board of agriculture should turn over to such industrial school annually the whole residue of their funds from licenses on fertilizers remaining over, and not required to conduct the regular work of the department. By chapter 348, Pub. Laws 1891, the provision of section 6, c. 410, Pub. Laws 1887, above cited, is stricken out, and the following provision is substituted in lieu thereof:

"The said board of trustees [referring to the trustees of the North Carolina college of agriculture and mechanic arts, which takes the place of the industrial school created by the act of 1885] shall have power to accept, on behalf of the state, donations of property, real or personal, and any appropriations made by congress * * * for the benefit of agricultural experiment stations, or agricultural and mechanical colleges."

Section 5 of this act appropriates $10,000 annually for the years 1891 and 1892 to such college of agriculture and mechanic arts. The act of 1891 leaves in force section 2196 of the Code, which provides that the chemist of the agricultural department shall be paid out of the funds of the department of agriculture, section 2198 of the Code, which imposes certain duties upon the state geologist, and authorizes the state board of agriculture to pay for the expenses of the same, and section 2206 of the Code, which appropriates $500 annually of the money received from the tax on fertilizers to the North Carolina Industrial Association, to be expended under the direction of the board of agriculture. By section 2208 of the Code it is provided that all moneys arising from the tax on licenses, and from various other sources specified, shall be paid into the state treasury, and shall be kept in a separate account by the treasurer as a fund for the department of agriculture. The ordinary repealing clause are annexed to the two acts hereinabove cited from the Laws of 1891. Although, as has been said, chapter 348, Laws 1891, does not repeal section 2206 of the Code, the section appropriating $500 annually of the money received from the tax on fertilizers, yet a later act refers to the subject of an appropriation to said association. This is chapter 426, Laws 1891, which provides that an appropriation of $500 be made to the treasurer of said association, to be paid by the state treasurer. This act refers to no particular fund as the source from which such payment shall be derived.

The constitutional objection to this legislation is that it is, it is claimed,

a regulation of commerce.     The answer of the state's counsel in sustaining the tax is that it is an inspection law.     The reply made to this answer by counsel for plaintiff is, first, that it appears from the whole scope of the legislation that the imposition in question is not intended in good faith to be a compensation to the state for the cost of inspecting commercial fertilizers; that this appears from the alleged fact that the amount is in excess of what would be necessary to pay such cost; and the court is asked, if it be in doubt as to whether this be true, to direct an investigation of the question of what would be the necessary cost of the inspection of commercial fertilizers under the act of 1891, and whether the imposition of a charge of 25 cents per ton be not in excess of what is absolutely necessary to the enforcement of the law.     Counsel further contend that the law cannot be an inspection law because it is directed to the subject of articles not the products of the state enacting the regulation; and, further, if not technically an inspection law, that it cannot be upheld on the analogous ground of being a police regulation in the nature of an inspection law, because the police power of the state is confined to the protection of the public health, the public morals, or the public safety.     I will consider these contentions in the order above given.

1. I concur with counsel for plaintiff that if the imposition of 25 cents on each ton of commercial fertilizer be not either an inspection impost, or cannot be supported on some analogous ground, it must fail, as being a tax on interstate commerce.     The general taxing power of a state extends only to property within its geographical limits, or owned as the personalty of its residents.     A reading of the law now under discussion may leave it questionable whether, as far as it affects or intends to affect fertilizers manufactured outside of North Carolina by citizens and residents of other states, the imposition considered as a tax is not payable before the property taxed comes within the jurisdiction of the state.     Under any construction of the statute it is chargeable upon the merchandise before it becomes mingled with the general mass of personalty of the state.     Possibly, in the view taken of the subject in the *New Orleans Coal Case,* (*Brown* v. *Houston*,) 114 U. S. 622, 5 Sup. Ct. Rep. 1091, this might not be fatal were the imposition a part of a law taxing at equal rates all taxables; but it is too clear, it would seem, to require any citation of authority that, considered as a specific burden upon a particular article imported from another state, the fertilizers cannot be subjects of state taxation until they are mingled with the general mass of the goods within the state's limits.     By section 1 of the first-cited act of 1891 it is provided that the tax shall be paid before delivery to agents, dealers, or consumers in the state, and in various parts of the act it is made penal for any one, including a common carrier, to deliver any fertilizer not bearing upon it, in the shape of a tag, evidence that the tax is paid.

2. The opinion of the court being that the imposition cannot be sustained as a tax on merchandise, I pass to the question of whether it can

be supported as an inspection law, or, on any other ground, as a law regulating the internal commerce of the state.

"Inspection laws are not, strictly speaking," says Chancellor Kent, "regulations of commerce. Their object is to improve the quality of articles produced by the labor of the country, and to fit them for exportation or for domestic use. These laws act upon the subject before it becomes an article of commerce. Inspection laws, quarantine laws, and health laws, as well as laws regulating the internal commerce of a state, are component parts of the immense mass of residuary state legislation over which congress has no direct power, though it may be controlled when it directly interferes with their acknowledged powers." 1 Kent, Comm. *439.

The act imposing a tax of $500 per annum for each separate brand of fertilizer (Code, § 2190) is imposed as a privilege tax. Amended section 2190, Laws 1891, c. 9, in terms imposes not a tax, but "a charge," of 25 cents per ton on fertilizers, "for the purpose of defraying the expenses connected with the inspection of fertilizers." It is thus expressly imposed as an inspection tax. The strong presumption is that the declared purpose of the drafter of the statute is its real purpose, and no court will lightly assume the contrary. In fact a doubt is expressed by high authority, of the power of the United States courts to pass upon the subject of whether such an imposition is too large for the necessary expenses of inspection. In *Neilson* v. *Garza*, 2 Woods, 287, Mr. Justice BRADLEY says that it may be doubtful whether it is not exclusively the province of congress, and not at all that of a court, to decide whether a charge or duty under an inspection law is or is not excessive. Mr. Justice BLATCHFORD, in citing *Neilson* v. *Garza*, adds that there was nothing in the record from which it could be inferred that the state of Maryland intended to make its tobacco inspection laws a mere cover for laying revenue on exports. *Turner* v. *Maryland*, 107 U. S. 38, 2 Sup. Ct. Rep. 44. A distinction is to be readily deduced, from authority on the subject of inspection and kindred laws, between the question of whether the courts of the United States will pass upon the alleged excessive charge imposed by the law, and that of the consideration of whether a state legislature, or perhaps, as it were better or more correct to say, the framer of a state statute, has intended, under the guise of a pretended charge for the expenses of inspection, to impose a tax on imports or exports, or commerce between the states, or any subjects not properly liable to state taxation. I think that in cases of this character the court is not required to go into an examination of the question of whether the imposition is excessive, unless for the purpose of deciding whether the tax is only colorably an inspection charge, or a charge of a kindred nature. The case in the supreme court of *Packet Co.* v. *Aiken*, 121 U. S. 444, 7 Sup. Ct. Rep. 907, illustrates the subject. The syllabus is:

"A municipal tax which authorizes the collection of a wharfage rate, to be measured by tonnage, estimated to be sufficient to light the wharves, keep them in repair, and construct new wharves as required, and which may realize a profit over expenses, does not violate the constitution, as being a duty or burden upon commerce."

The supreme court, expressing its opinion by BRADLEY, J., says:

"We see nothing in the purposes for which the lessees were required to expend or pay money at all foreign to the general object of keeping up and maintaining proper wharves, and providing for the security of those that use them. * * * In all such cases of local concern, though incidentally affecting commerce, we have held that the courts of the United States cannot, as such, interfere with the regulations made by the state, nor sit in judgment on the charges imposed for the services rendered under state authority. It is for congress alone, under its power to regulate commerce with foreign nations and among the several states, to correct any abuses that may arise, or to assume to itself the regulation of the subject. * * * If in any case of this character the courts of the United States can interfere in advance of congressional legislation, it is where there is a manifest purpose by roundabout means to invade the domain of federal authority."

*Turner* v. *Maryland, supra,* is a case of the former class; *Brimmer* v. *Rebman,* 138 U. S. 78, 11 Sup. Ct. Rep. 213, and *Minnesota* v. *Barber,* 136 U. S. 313, 10 Sup. Ct. Rep. 862, are cases where the United States courts interfered with state statutes on the ground of manifest purpose to invade the domain of federal authority.

It remains to be considered whether the tonnage tax of 25 cents on commercial fertilizers manifests an evident intent, under the guise of an inspection law, to impose taxation on interstate commerce. The fact, were it true, that the amount of the tax might upon investigation turn out to exceed the sum required to reimburse the state for the cost of inspection, would not, in the view the court takes of the principles of law involved, be at all decisive. The question would perhaps be somewhat analogous to the inadequacy in the consideration in a contract of sale, which might be evidence of fraud, but not conclusive of it, unless sufficiently great to at once "shock the conscience." The verified answer of the board states that the amount collected in 1891 under the existing law was $32,894; that $24,000 is all that has been or can be collected during the year 1892. It further states that the number of brands to be analyzed is 350. If such be the case the amount of the tax under the old law, as it existed before 1891, on fertilizers, at the rate of $500 per brand, would have been $175,000. Doubtless the reduction in the amount of the tax has been the cause of the introduction into the state of some brands of fertilizer that would not have paid the tax of 1890. Of course, it would have been impossible, in advance of actual results, to have determined the precise imposition which would have covered the cost of inspection. The case has been heard upon bill and answer and certain proofs.

The tax of 25 cents per ton on fertilizers resulted in 1891 in producing about $33,000. The estimate, which seems a reasonable one to me, for 1892, is that it will pay $24,000. It is, in the account produced, mingled with other receipts of the department of agriculture. There is no provision in the North Carolina statutes for keeping separate accounts of the cost of the work done under the fertilizer law, and under other branches of the duties of the department of agriculture. The entire expenses—actual, $14,022.47; estimated about $3,300—of the depart-

ment of agriculture for the six months (December 1, 1891, to May 31, 1892) are $17,352.47.   These charges include:

| | |
|---|---:|
| Board and committee meetings, | $1,452 60 |
| Inspector's expenses, | 2,398 18 |
| Gas and water, | 1 75 |
| Paper, printing bulletins, and other office work, | 1,435 53 |
| Salaries and wages, | 2,175 00 |
| Attorneys' fees, | 534 00 |
| Subscription to periodicals, | 39 00 |
| Analytical, | 5,000 00 |
| Postage, express, freights, etc., | 985 00 |
| ESTIMATED. | |
| Gas and water, | 40 00 |
| Paper, printing, etc., | 90 00 |
| Attorneys' fees, | 200 00 |
| Analytical, | 3,000 00 |
| Total, | $17,352 00 |

Some of these charges cannot properly be, as a whole, charged to the inspection of fertilizers; how many of them can, it is impossible to say. I should suppose that on the whole the tax on the fertilizer will produce enough to pay the inspection charges, with a considerable margin. It is upon such a supposition that I pronounce my opinion. If I were to hold that the charge upon fertilizers would be unconstitutional, if it could be shown to produce more than enough to pay the inspection charges, I would be compelled either to decide against the state at this stage of the case, or to direct an inquiry with a view to ascertaining the exact amount produced by the tax, and the exact amount of the cost of the department properly chargeable to inspection.   Upon the coming in of the report some such questions as these would arise: Does the charge of $8,000 for analysis in whole or in part belong to inspection?   It is averred by the answer that it does.   What part of the general expenses of the board of agriculture ought the board to charge for inspection?   In fact, the court would be compelled to supervise the entire subject of the expenditures of the board.   This would be, for many reasons, inconvenient, and, as I think, could produce no good result.   The amount of the inspection tax appears a reasonable one; not excessive, of itself, so as to make it probable that it would check importation.   Putting the case, as I do, upon the position that the imposition could not be decided unconstitutional by the circuit court, simply upon the ground of alleged excess, if the excess does not show a purpose to evade an inhibition of the constitution, I have come to the conclusion that I cannot say that such intention appears in the amount of the tax.

I will proceed to give the facts of a case which sustains fully the principle on which this decision is based.   It is the leading one in the reports of the United States on the subject of inspection laws; that of *Turner* v. *Maryland*, 107 U. S. 38, 2 Sup. Ct. Rep. 44, which involved the constitutionality of the Maryland inspection laws.   The act of the

legislature of Maryland of 1864 provided for the appointment of five tobacco inspectors, and a number of clerks, whose salaries were to be paid from the receipts of their respective offices.   These inspectors were to cause each hogshead of tobacco to be numbered, and to enter the number, time of receipt, etc., the name of owner or consignee, etc., in a book to be kept by each of them.   It was further provided that the tobacco in each hogshead should be inspected; that each hogshead, with the tobacco it contained, should be separately weighed; and that each hogshead should be branded with the weight of the tobacco and of the hogshead.   Provision was made for taking samples from each hogshead; for sealing and delivering to owners certificates of inspection of all merchantable tobacco; and for repacking and reweighing unmerchantable tobacco.   It was made unlawful to take out of the state any uninspected tobacco in hogsheads.   An amendatory act was passed in 1870, which allowed any grower or purchaser of tobacco to pack the same in counties where grown without having it opened for inspection. However, by the amendatory act it was provided that such tobacco, whether or not opened for inspection, could only be packed in casks of a specified size, and should be liable to the full charge for outage and storage.   By an act of 1872, such charge was fixed at $2 for a hogshead of 1,100 pounds.   No inspection of the quality of the tobacco was required, but it was the duty of the grower or packer to have his tobacco delivered, packed by him, at some one of the state's tobacco warehouses, that the inspectors might ascertain whether it was packed in hogsheads of the proper dimensions, and whether it had been packed in the neighborhood, and where it was grown, and marked as required by statute; and for this service, and no other, the owner of such tobacco was required to pay a charge of two dollars for every hogshead.   No further duty was required of a tobacco inspector than to keep a record of the facts of each case, and to weigh the tobacco, and brand the weight on each hogshead.   A question passed upon by the supreme court in this case was the validity of the law as an inspection law, in view of the fact that the plaintiff contended that the amount of the charge for such inspection was excessive.   The decision of the court was in favor of the constitutionality of the law.

What I have already said disposes of the contention of plaintiff that contingently there ought to be a further inquiry in this case.   But it is contended by the plaintiff that the law under consideration in this case shows upon its face, by various provisions made for the expenditure of the money collected under the law, that the intention of the legislature was to collect a sum more than sufficient to pay the expense of inspection.   An ingenious argument was made by Mr. Hill, the purpose of which was to show that certain provisions of law which had the effect of repealing appropriations made from the funds derived from the original fertilizer tax had the effect of reviving certain previous appropriations of money derived from the proceeds of such fertilizer tax.   I am not disposed to deny the truth of the general proposition that the repeal of a repealing law does, in the absence of any special circumstances,

revive the law repealed.    This proposition is laid down in Dwar. St. p.
676.    In *Brinkley* v. *Swicegood*, 65 N. C. 628, PEARSON, C. J., says:

"The act of 1870–1871 repeals the Code of Civil Procedure in regard to costs,
and makes no provisions for costs in the matter now under consideration; so
the effect is to restore the Revised Code in that particular."

But the question is one of the intention of the legislature.    In the
case before the court the legislature of North Carolina had, by the law
of 1885, made an appropriation to the industrial school of $5,000 an-
nually.    By an act of assembly, passed in 1887, which must be con-
strued to be substituted for the act of 1885, and therefore to be a re-
pealing law, the legislature of North Carolina appropriated to such
school all the surplus arising from the proceeds of the tax on fertilizers.
In 1891, an act of the legislature was passed, the effect of which, it is
conceded, was to repeal the appropriation made to the state industrial
school by the act of 1887.    It is contended by Mr. Hill, for the plain-
tiff, that the repeal in 1891 of the act of 1887 revived the act of 1885,
and that it results from this revival that $5,000 of the fund arising from
the present tax on fertilizers is now appropriated to the state industrial
school.    The same argument is used to show that by existing legisla-
tion $500 of the proceeds of the tonnage tax on fertilizers is annually
appropriated to the North Carolina Industrial Association, which is, as
the court is informed, a negro agricultural fair.    The argument drawn
from this contention is that the state to-day appropriates at least $5,500,
annually, of the money derived from the tonnage tax to purposes other
than the cost of inspection of fertilizers, and that this fact proves that
the amount of the tonnage tax was intentionally made larger than was
necessary.    The court is of the opinion that such was not the intention
of the legislature.    This court had at its June term, 1890, (43 Fed. Rep. 609,)
decided that the then existing tax upon commercial fertilizers was uncon-
stitutional, and had given as a reason for one of its positions, to wit, that
the then existing tax on fertilizers could not be supported on the ground of
its being an inspection tax, the fact that a large portion of the proceeds
of such tax was appropriated for other than inspection purposes.    At the
ensuing session of the legislature of North Carolina in January, 1891,
an act was passed which has been hereinbefore recited, and which in
express terms repeals all laws conflicting with itself.    By the first sec-
tion of this act, which imposes a tax of 25 cents per ton on all commer-
cial fertilizers, the legislature declares the purpose of the tax to be for
inspection only.    The previous law had imposed a tax of $500 per
brand upon every brand and description of fertilizer, and declared the
same to be a privilege tax.

The tonnage tax of 25 cents is declared by the first section of the
act of 1891 to be substituted for the $500 privilege tax.    This court
will not infer, simply for the purpose of enforcing an ancient rule
of law having for its basis only the presumed intention of legisla-
tures, that the purpose declared in the act of 1891 is falsely declared,
and by an implication which contradicts the declared will of the leg-
islature, that the repeal of sections of the Code which had been de-

clared unconstitutional should have only the effect of reviving earlier laws equally objectionable with those that were attempted to be repealed. The court is of the opinion that, under existing legislation, there is no appropriation of the proceeds of the tonnage tax directly to the support of the industrial school, now called the "State Agricultural and Mechanical College," or the "North Carolina Industrial Association." If it should be otherwise, however, it was not intended, and therefore does not affect the case. Certain appropriations are made, in unrepealed sections of the Code of North Carolina, from the funds of the state board of agriculture, for various purposes,—such as that, under section 2196, for the salary of an analyst; under section 2198, to a geological museum; and, under some other sections, to various other purposes. But these appropriations are to be paid out of the general funds of the state board of agriculture, which are derived from other sources, as well as from the tonnage tax on fertilizers, and are not directly appropriated out of the tonnage tax. In lieu of the appropriation of the surplus funds derived from the tax on fertilizers, given by the act of 1887 to the state agricultural college, an annual sum of $10,000 is directed to be paid out of the treasury of the state to such college; and in lieu of the $500 directed to be paid out of the fertilizer tax to the North Carolina Industrial Association, an annual appropriation of $500 from the public treasury is made to the same. Chapter 338, Laws 1891, makes a provision for the oyster industries of the state from other sources than the fertilizer tax. Chapter 417, Laws 1891, makes an appropriation of $10,000 direct from the treasury to the state geological survey, so that it is evident that the legislature of 1891 repealed all laws making any substantial diversion of the money to be derived from the tonnage tax on fertilizers to any other purpose than to such as are directly or indirectly connected with the expense of inspection, leaving the real question for the court only whether the tax of 25 cents per ton appears in itself so excessive as to indicate a purpose other than that declared on the face of the law. Upon this question the court has already declared its opinion.

3. But one question remains to be discussed. In the collation of inspection laws given in the note to the case of *Turner* v. *Maryland,* no statute is mentioned which, under the guise of an inspection law, imposes an inspection tax upon things not grown in or produced in the state enacting the inspection law, and there is as yet no decision of the supreme court approving of the validity of any law imposing a charge for the inspection of articles grown or produced outside of the state. In the very recent case of *Voight* v. *Wright,* 141 U. S. 62, 11 Sup. Ct. Rep. 855, BRADLEY, J., in rendering the opinion of the court, says:

"The question is still open as to the mode and extent in which state inspection laws can constitutionally be applied to personal property imported from abroad or from another state."

This question was not decided in *Voight* v. *Wright,* which was a case arising under the Virginia act of 1867, providing for the inspection of flour brought into the state, and offered for sale therein, and which went off on the ground that the Virginia law in question discriminated

in favor of Virginia-made flour, and against flour manufactured in other states. The point must necessarily be passed upon in the decision of this case. I do not think it necessary to expressly state that this law is technically an inspection law, though I see no reason why it should not be so called. Whatever called, it seems to me to be a law that the state of North Carolina has the power to enact under the general powers reserved from the grant of other powers to the United States.

It is not worth while to discuss the question of whether it is one of the police powers of the state. It is, in effect, a law to provide for the security of purchasers in buying an article whose contents and qualities cannot be determined by ordinary inspection, but only by analysis and the use of the knowledge of experts. It would seem that there can be no reason why, in the absence of any constitutional objection, a state should not have the power, in the regulation of its internal commerce, to say that articles of this description shall not be sold within its limits without inspection. It is a law enacted to protect the citizens of the state from fraud. Neither do I know of any reason why the state should not be permitted to charge the cost of the inspection upon those offering such articles for sale.

The judgment of the court is that the injunction heretofore granted be dissolved, the bill dismissed, and that the defendant have judgment for costs against the plaintiff and its surety on the prosecution bond.