## *In re* REBMAN.

### *(Circuit Court, E. D. Virginia. April 7, 1890.)*

CONSTITUTIONAL LAW—REGULATION OF INTERSTATE COMMERCE—MEAT INSPECTION LAW.

Acts Va. 1889-90, c. 80, p. 63, requiring all fresh meat which shall have been slaughtered 100 miles or more from the place where it is offered for sale, to be inspected before it is offered, and providing for payment by the owner of one cent per pound for such inspection, is unnecessary and unreasonable, and, since it has the effect of excluding dressed meat slaughtered outside the state, is unconstitutional as usurping the exclusive power to regulate interstate commerce given congress by Const. U. S. art. 1, § 8.

Petition for a Writ of *Habeas Corpus.*
*W. J. Campbell* and *Wm. H. White,* for petitioner.
*R. Taylor Scott,* Atty. Gen. Va., and *Robert M. Hughes,* for respondent.

HUGHES, J.   William Rebman is the agent of Armour & Co., of Chicago, who are shippers of fresh dressed beef from Chicago to Norfolk for sale to consumers.   A recent act of the legislature of Virginia imposes a charge of one cent a pound for inspection upon fresh meat intended for sale at places 100 miles and more from the places of slaughter, requires it to be inspected before it is offered for sale, and imposes a fine of $50 to $100 for selling without inspection.   This law was disregarded by Rebman, as violating the constitution of the United States.   He made a sale of beef which had not been inspected, was arrested, and tried by a justice of the peace of Norfolk, and fined $50 for the offense.   Refusing to pay the fine, he was imprisoned in the city jail of Norfolk.   On his petition for the writ of *habeas corpus,* the case is heard by this court, on the question whether the law of Virginia, commonly called the "Fresh Meat Inspection Act," is in violation of the federal constitution.

The supreme court of the United States has held in many cases that the clause of section 8, art. 1, of the national constitution, which gives to congress power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes," gives the power exclusively to congress; and that when congress refrains from exercising it in relation to any subject, commerce in that respect is free, and cannot be interfered with by the states.   The most important of the cases establishing that principle are cited by the court in *Brown v. Houston,* 114 .U. S., at page 631, 5 Sup. Ct. Rep. 1091, decided in 1884, and need not be enumerated here.   In quite a number of subsequent cases, the supreme court has laid down the same doctrine in applying it to a constantly varying condition of facts.   The circuit courts of the United States, and the supreme courts of several of the states, have announced this view of the law, and enforced it in many cases coming before them; and no doctrine is more firmly established than this is in American jurisprudence. Indeed, Mr. Justice BRADLEY, in *Stockton v. Railroad Co.,* 32 Fed. Rep. 17, in a circuit court case, has said very compendiously, that—

"The power of congress is supreme over the whole subject [of interstate commerce] unimpeded and unembarrassed by state lines or state laws; that, in this matter, the country is one, and the work to be accomplished is national; and that state interests, state jealousies, and state prejudices do not require to be consulted.   In matters of foreign and interstate commerce, there are no states."

The union of the American states could not have been formed, under the constitution of 1787–89, but for the necessity which was felt for a fundamental provision that should absolutely exempt commerce between the states from all incumbrance and obstruction by any and every state; and the miraculous growth of the American Union in population, wealth, and prosperity is, in all probability, as largely due to the perfect freedom of trade between the states as to any other cause.   It is true that this

exclusive power of congress over interstate commerce, this absolute freedom of trade between the states, exists concurrently with the inherent and natural power of the states by police, inspection, and even tax laws, to regulate their internal affairs, and to provide for the safety of their own communities. It is also true that this right of the state, in frequent instances, does conflict, or seems to conflict, with the exclusive power of congress over the instrumentalities and commodities of interstate commerce; and therefore, whenever this apparent conflict arises, the courts, both state and federal, are called upon to perform the duty, sometimes difficult and occasionally invidious, of defining the relative powers of the two authorities.

On this subject the supreme court has laid down some general principles as guides in cases of apparent conflict. In *Railroad Co.* v. *Husen*, 95 U. S. 465, the court said:

"While we unhesitatingly admit that a state may pass * * * laws * * * for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the state; while, for the purpose of self-protection, it may establish quarantine and reasonable inspection laws,—it may not interfere with transportation into and through the state, beyond what is absolutely necessary for its self-protection. The police power of a state cannot obstruct foreign * * * or interstate commerce beyond the necessity for its exercise; and, as its range sometimes comes very near to the field committed by the constitution to congress, it is the duty of the courts to guard vigilantly against any needless intrusion."

In *Henderson* v. *Mayor*, etc., 92 U. S. 272, the supreme court said:

"It must occur very often that the shading which marks the line between one class of legislation and another is very nice, and not easily distinguishable. But, however difficult this may be, it is clear * * * that, whenever the statute of a state invades the domain of legislation which belongs exclusively to the congress of the United States, it is void, no matter under what class of powers it may fall, or how closely allied to powers conceded to belong to the states. The right of a state to protect herself by necessary and proper laws against paupers and convicted criminals from abroad can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity."

In *Bowman* v. *Railway Co.*, 125 U. S. 506, 8 Sup. Ct. Rep. 689, 1062, Mr. Justice FIELD said:

"It is perhaps impossible to state any rule which would determine in all cases where the right to sell an imported article under the commercial power of the federal government ends, and the power of the state to restrict further sale has commenced. Perhaps no safer rule can be adopted than the one laid down in *Brown* v. *Maryland*, [12 Wheat. 439,] that the commercial power continues until the articles imported have become mingled with and incorporated into the general property of the state, and not afterwards."

In the case in Wheaton, Chief Justice MARSHALL had said:

"Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce."

In *Mugler* v. *Kansas*, 123 U. S. 623, 8 Sup. Ct. Rep. 273, the supreme court said:

"It does not at all follow that every [state] statute, enacted ostensibly for the promotion of [proposed] ends, is to be accepted as a legitimate exertion of the police powers of a state. There are, of necessity, limits beyond which [state] legislation cannot rightfully go. * * * The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, —indeed, are under a solemn duty,—to look at the substance of things, whenever they enter upon the inquiry, whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

In the case of *Bowman* v. *Railway Co.*, already cited, the supreme court said:

"A state cannot impose such taxes upon property imported into this state from abroad, or from another state, and not yet become a part of the common mass of property therein; and no discrimination can be made by any such regulations adversely to the persons or property of other states; and no regulations can be made directly affecting interstate commerce."

In *Walling* v. *People*, 116 U. S. 446, 6 Sup. Ct. Rep. 454, the supreme court said:

"A tax imposed by a statute of a state upon an occupation which necessarily discriminates against the introduction and sale of the products of another state, or against the citizens of another state, is repugnant to the constitution of the United States."

It would be quite impracticable on the present occasion to consider all the decisions which the supreme court has rendered on the general subject of conflicts between state and federal laws; and to discriminate between those decisions, in which it has pronounced state laws unconstitutional and void, and those in which it has held them to be valid. From the decisions mentioned in the foregoing paragraphs, I have extracted only such expressions of the court as serve to outline the principles of law which govern the case at bar. While counsel for the petitioner object to the Virginia statute under consideration, chiefly as violating the interstate commerce clause of the constitution, they also maintain that it violates the clause of section 2, art. 4, of the constitution, which declares that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." It is chiefly with reference to the interstate commerce clause that I shall consider the Virginia statute complained of by petitioner; the other is a cumulative provision.

The general principles of law governing the case at bar having been set out, I turn to the facts which it presents. I am at liberty to take judicial cognizance of the fact that a very large interstate trade exists in fresh dressed meats. I am at liberty to take cognizance also of geographical distances, and of the fact that the Virginia statute, in imposing a charge of one cent per pound on all fresh meats offered for sale at 100

miles or more from the places of slaughter, imposes this charge on fresh meats brought from all other states of the Union; and, as to those cities of Virginia having 15,000 inhabitants, imposes it upon meats brought from all or nearly all that portion of Virginia lying west of the Blue Ridge mountains. On the subject of the magnitude and importance of the interstate trade in fresh dressed meats, I adopt the language of the circuit court of the United States for the northern district of Illinois, in *Swift* v. *Sutphin*, 39 Fed. Rep. 631:

"Dressed meats have been, from time immemorial, articles of local commerce, * * * and the courts will take judicial notice that within the last few years, by means of new appliances for the preservation of such meats, and the facilities for rapid transportation by means of railroads, a large, and it may be said, a new, business has grown up in the slaughtering and transporting of * * * meats for human food to distant points from the place of slaughter; so that this business has now become an important item of interstate commerce. The press teems with accounts and statements of the magnitude of the business. The traveler journeying over our railroads meets at almost every point cars constructed and adapted expressly for such business. The records of the patent-office show the invention and patenting of many cars and warehouses specifically designed for conducting such business, and at the late session of congress a committee was appointed by the senate to investigate during the recess, and report * * * upon some of the phases and methods of said business; so that there can be no doubt, from common knowledge, that to-day dressed meats for human food are articles of interstate commerce."

Dressed fresh meats being an article of general interstate commerce, of great and growing magnitude and importance, the facts of the case at bar seems to be these: The petition of the prisoner sets forth, among other things, that at the time of the passage of the Virginia act there were no persons, firms, or corporations conducting the dressed beef business anywhere in the state of Virginia, and none anywhere having their slaughter-houses as near the cities of Richmond and Norfolk as 100 miles; and that the said act applied to no other persons engaged in the dressed beef business, except those who slaughter their cattle and prepare fresh meats for distant markets outside of the state of Virginia. In an affidavit made by the petitioner subsequently to the filing of his petition—an affidavit which I think, under the circumstances, may be considered by the court, this being a *habeas corpus* case, upon a prayer for personal liberty—it is alleged that Armour & Co. and another firm in Chicago, as well as persons in Kansas City, Mo., Omaha, Neb., and Hammond, Ind., are engaged in the business of slaughtering cattle and shipping fresh dressed beef to other states; that Armour & Co. and others were, previously to the 1st day of March, 1890, selling in the state of Virginia fresh beef from animals slaughtered at Chicago; that Armour & Co. and Swift &. Co. were so selling in the city of Norfolk, have sold since the 4th of March, 1889, respectively, 2,380 and 2,000 carcasses, aggregating, respectively, 1,307,372 and 1,178,000 pounds of Western dressed beef; that the total amount of such beef sold in Norfolk for the year ending February, 1890, was 2,485,872 pounds; that these two firms have also houses for the sale of this article in Richmond, and that

the firm of Nelson, Morris & Co. had up to March 1, 1890, a house in the same business at Petersburg in this state; that the total amount of this article shipped by these houses to Virginia up to February 28, 1890, within the previous 12 months, was 4,587,000 pounds; that the average amount of dressed beef in a car-load is 16,500 pounds, the freight charge on which, from Chicago to Norfolk, does not exceed 15 cents per 100 pounds, or but half the amount of the charge imposed by Virginia for inspection; that the average price received by Armour & Co. for the fresh beef sold in Norfolk is five and a quarter cents a pound; that the commission paid for selling is two fifths to half a cent; and that the net price received on the beef on board the cars at Chicago, making no allowance for icing, which costs $10 per car-load and is paid by the owners, is four and a quarter cents per pound; that there are no persons carrying on the dressed beef business, embracing slaughtering and shipping in Virginia; that the time occupied by inspectors in inspecting a carload of dressed beef, under the Virginia law, is not more than 50 minutes, for which they are allowed by the law $165; that on the business done in Norfolk in the 12 months ending February 28, 1890, the charge imposed by this law would have been $34,850, or 20 per cent. of the selling price of the beef, and 25 per cent. of the amount received from the beef in Chicago after deducting freight and selling charges; that there are two inspectors at Norfolk, whose compensation on the sales at Norfolk during the 12 months mentioned, after paying into the state treasury one-half of their fees, would have been $12,400, or $6,200 each; that the inspection fee of one cent per pound on the entire business done in the state of Virginia during the period mentioned would have been $45,870; that the said inspection fee of one cent per pound is in fact a prohibition against the sale of Western dressed beef in the markets of Virginia; that, coming in competition here, as the shippers of this article do, with local slaughterers, who are not required to pay any inspection fee, the discrimination against fresh beef brought from Chicago and the West, of one cent per pound, is so great as to make it impossible to carry on the business except at a loss; that the effect of the act has been to stop the business, and no fresh dressed meats, slaughtered as described, are now sold in Norfolk, except an occasional order filled from Baltimore. Finally, that no person, firm or corporation prior to, at, or since the passage of the Virginia law, had or has been engaged in selling fresh beef slaughtered a hundred miles distant, at any place in Virginia, having less than 15,000 inhabitants.

The act of Virginia complained of recites that "whereas, it is believed that unwholesome meats are being offered for sale in this commonwealth," it therefore enacts, in section 1, that it shall not be lawful to offer for sale within this state, any fresh meats, beef, veal or mutton which shall have been slaughtered 100 miles or over from the place at which it is offered for sale, until and except it has been inspected and approved as hereinafter provided. In section 2 it provides that each county and corporation court shall appoint one or more inspectors of fresh meats when petitioned so to do by 20 citizens, and makes it the

duty of the inspectors to inspect and approve or condemn all fresh meats offered for sale which have been transported 100 miles or more from the place of slaughter. In section 3 it imposes a charge of one cent a pound upon the owner of the meat inspected, payable to the inspectors. In section 4 it makes it the duty of all owners of fresh meat, before offering it for sale, to apply to the inspector for the inspection of their meat, and imposes a fine of not less than $50 nor more than $100 for each failure so to do, recoverable before any justice of the peace; and provides that in cities of 15,000 inhabitants or more half of the fees received by the inspectors shall be paid into the state treasury. But the counties of Accomac and Northampton are exempted from the operation of the act. In section 5 it requires the inspectors to make oath that they will faithfully perform their duties, and allows the courts appointing to remove them from office. In section 6, and last, it provides that the act shall be in force from the 1st of March, 1890. See Acts Va. 1889–90, c. 80, p. 63.

Upon the authorities and case thus presented, I come to consider whether or not the Virginia "Act to prevent the sale of unwholesome meats" is constitutional, and has precedence as an inspection law over constitutional provisions for securing the freedom of trade between the states. It is undeniable that a state of this Union, like all other self-governing states, has the power to enact inspection laws for the public safety. It has as clear a right to this power as it has to existence. It may enact and enforce inspection laws, adapted to secure the public safety, even though they trench upon, and more or less obstruct, the freedom of trade between the states. It is equally true, however, that inspection laws, to be within the sovereign prerogative of the state, and to stand superior to cardinal provisions of the national constitution, must be essentially and really such in character, purpose, and operation. To call a law an inspection law does not make it one competent to override any tenet of constitutional law. It must be an inspection law in spirit and in truth, in order that its character as such shall be respected; and even though it be, in its essence and design, an inspection law, yet, in order that it may not be subordinated to the provision of the constitution establishing the freedom of interstate commerce, it must be a "reasonable" law, properly devised for preventing the evil at which it is aimed; so devised as to no more than effectuate that purpose, and as not to subserve other objects unessential to the public safety. When inspection laws are abused for the latter ends, and thereby affect foreign commerce and trade between the states, it is competent for the national courts—it is made our "solemn duty"—to pronounce them invalid, and to forbid their enforcement. The framers of the national constitution indicated their apprehension of the abuses of which state inspection laws would be susceptible, and of the necessity of subjecting them to stringent limitation, in the remarkable clause 2, § 10, art. 1, of that instrument, in which, giving the states power to impose inspection charges upon foreign commerce, they required that previous leave should be obtained from congress to impose them; that the laws when passed should be subject to congressional re-

vision and control; that the moneys arising from such charges should be paid into the national treasury; and that the charges should be only such as were "absolutely necessary" for executing the inspection. They gave no such express power in respect to inspection charges upon commerce between the states; an omission which implies that they intentionally withheld it. *Expressio unius exclusio alterius.* But whether intended or not, their rule for inspection charges was "absolute necessity." The supreme court rule for inspection charges upon interstate commerce we have seen to be milder, in requiring only that they be "reasonable."

And so, it seems to me, the question at bar is resolved into the inquiry whether or not the meat inspection law of Virginia is reasonable and necessary, is directed against a dangerous evil, has an eye single to the prevention of that evil, and provides for the prevention in a manner less injurious to the constitutional rights of citizens of our sister states than any other that could be devised. True, a preliminary inquiry is whether this case is within the cognizance of this court. The act not only forbids the sale here before inspection of fresh beef, veal, and mutton slaughtered in other states, but forbids them from being offered for sale until after the inspection is had and paid for. It attaches the meat before it becomes mingled with the general property of the state, and while it is yet an article of commerce between the states; and requires its inspection, and subjects it to the inspection charge, while it remains distinctly a commodity of interstate commerce. In this respect, such a law is emphatically condemned by Chief Justice MARSHALL in *Brown* v. *Maryland,* in the language already quoted. For this reason, if there were no other, this court may take cognizance of the case. Doing so, the first inquiry is, whether this law was necessary to the public health and safety. This is not asserted by the act itself, and it is in no way shown *aliunde.* On the contrary, it is a matter of common knowledge that though dried, canned, and cooked meats may, while on the market, contract elements of poison or decay not detectable by consumers, yet that fresh meats, when unsound, reveal the fact in a manner so obvious to the senses that purchasers are seldom if ever deceived as to the fact. The only exception to the rule is the case of fresh pork, and although raw pork is in some instances notoriously dangerous from an insect invisible to the naked eye, yet the Virginia law fails to embrace this, the only species of fresh meat really threatening to the public health, among its subjects of inspection. This law does not assert that unsound meats are certainly sold in the state; it simply expresses the belief that such meats are sometimes offered for sale. Surely no public emergency, no prevalent epidemic, no general danger, or popular apprehension of danger existed to render a law "absolutely necessary," or at all necessary, such as has never been before passed in the history of the commonwealth. This law does not purport on its face to have been necessary to public safety; and I am of the opinion that it was not so. But, even if it were, is it "reasonable" and appropriate in its provisions? It seems to me that a charge of 20 to 25 per cent. on the value of an article for mere inspection is unreasonable, and probably unprecedented.

We are familiar with the imposition of heavy duties on articles of foreign importation, laid for the purpose of protecting home articles of the same classes from competition; but such charges are unknown to inspection laws. To impose a charge of 20 to 25 per cent. on distantly slaughtered fresh meats, sold in competition with meats slaughtered at home, upon which no charge is imposed, is tantamount to a prohibition of the sale of the commercial meats. An inspection law may altogether prohibit the introduction of deleterious articles, (alcoholic spirits, for instance;) but if articles of general commerce are admitted, then any charge upon them for inspection beyond the cost of executing it is foreign to the rightful function and office of inspection laws. The heavy charge imposed by the law under consideration itself suggests that its real purpose was prohibition, and it is difficult to believe that such was not its purpose. If so, applying as it does to an important, and what has become an indispensable, article of commerce between the states, it is invalid. Reasonable inspection charges are not objectionable or illegal in their relation to general commerce; but when the power to impose them is abused to the purpose of destroying such trade, it becomes unconstitutional. Medicine judiciously administered cures the patient, but when the practitioner gives it in a dose to destroy life, he commits a capital crime. Prohibition of trade is destruction to trade, and when prohibitive inspection laws, if such anomalies can be, destroy trade between the states in any commodity of commerce, they violate the constitution of the United States, and subvert one of the most important objects for which the states, in mutual good faith, adopted that instrument. Even if it could be thought that the charge imposed by this law is not prohibitive, still it may be asked if the burden imposed is not unreasonable. Surely it ought not to cost owners of distantly butchered fresh meats twice as much to have them inspected as to have them transported in expensive cars, on railroad express trains, nearly half way across the continent. Surely an inspection service of less than an hour, rendered without labor, by eye and nostril only, ought to be rendered for a less compensation then $165.

Without entering into further detail I am of opinion that the burden imposed by this inspection law upon an important article of trade between the states is unreasonable, unnecessary, and therefore unconstitutional.

Though it is hardly necessary to do so, it may be well to inquire whether this is really an inspection law. Constitutional inspection laws are those which look only to the public health and welfare, and employ no other expedients to subserve these ends than such as are necessary and proper for the purpose. No charges which such laws impose are, as to general trade, legitimate but such as merely defray the expense of executing the inspection; and this expense must not itself be unreasonable. The law of Virginia far transcends this limitation. Half the moneys paid for inspection are given to inspectors, and the other half are ordered into the state treasury. On a year's business such as that of the last 12 months in the two cities of Norfolk and Richmond alone, this half would

produce $25,000 for the public fisc, if the charge should not destroy the trade. As to this half of the revenue arising from the inspection required, what is it but a tax? I know of no better definition of a tax than that it is a burden imposed by legislation upon persons or property, to raise money for public purposes, or for the accomplishment of some rightful governmental end. This law treats the money derived from the owners of the meats as general public revenue, and there is no provision declaring or implying that it is to be used for sanitary or inspection purposes. In terms an inspection law, it is in fact a law, taxing for the benefit of the state treasury a prime necessary of life, an universal article of human food, and an important commodity of general commerce. No one will pretend that a tax law which avowedly collects a revenue for the public treasury of a state from charges laid upon articles of interstate commerce, brought into the state for sale, is constitutional. Such is the law under consideration, nor can you change its essential character by calling it an inspection law.

I will sign an order for the discharge of the petitioner.

I have had this cause brought into the circuit court, and have heard it there, in order that it may be taken direct to the supreme court of the United States, where it will probably be heard as a privileged case.