### Ex parte SCOTT et al.

#### (Circuit Court, E. D. Virginia. March 4, 1895.)

OLEOMARGARINE—PROHIBITION OF SALE BY STATE—INTERSTATE COMMERCE.

Act Va. March 1, 1892 (Acts 1891–92, p. 840), entitled "An act to prevent the adulteration of butter and cheese, and the sale of the same, and preserve the public health," but in fact and substance prohibiting the sale of oleomargarine, is not a health law, but an interference with interstate commerce, and for that reason unconstitutional.

G. A. J. Scott and William McLean were committed for violation of the Virginia oleomargarine law, and each filed a petition for the writ of habeas corpus in this court.

Sam W. Small, for petitioners.
William H. White, for defendants.

HUGHES, District Judge. The petitioners are under arrest for trading in an article of commerce brought from another state. Their business would go to ruin if they were required to await all the proceedings in the state courts incident to appeal, and to reaching a final adjudication of their rights in the state court of final resort. This fact makes these cases cases of emergency, demanding immediate action by this court. It was in this view that I directed these writs of habeas corpus to be issued. The facts agreed between the prosecuting officers of the state and the petitioners are as follows:

"The accused (Scott) was at the time of his arrest engaged in Norfolk, Virginia, in the business of a wholesale dealer in oleomargarine, under and in compliance with the laws of the United States regulating the sale of that article. At the time of the arrest of the accused, he had in his possession for sale, and was selling, in the original, unbroken, and imported package, the article known as 'oleomargarine.' The packages containing the same were distinctly stamped with the word 'oleomargarine' in plain, Roman letters, not less than half an inch square. The said article was manufactured by Swift & Co., in the state of Illinois, and shipped by them from that state to the accused, at Norfolk, Virginia. Oleomargarine is nowhere manufactured in the state of Virginia, but is largely manufactured elsewhere, and enters extensively into the trade and commerce of this and other states of the Union. The printed copy of the regulations concerning oleomargarine under the internal revenue laws of the United States may be used as evidence in this case."

The question in these cases was before me, in the case of Ex parte Rebman, five years ago. 41 Fed. 867. There the state of Virginia had passed a law, which, stripped of its verbiage, was, in essence and purpose, a law forbidding the sale in this state of meats from animals slaughtered in other states. This law was held by me to be obnoxious to the provision of the national constitution giving to congress the exclusive power of regulating commerce

between the states. A dealer, in Norfolk, in canned and prepared meats, had been arrested, tried, and imprisoned for violations of this meat law of the state. Upon a writ of habeas corpus, and after a full hearing, I released Rebman. The case was appealed to the supreme court of the United States, and was there accorded a privileged hearing. Whereupon that court unanimously affirmed the decision here. Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213. In that case I said:

"Section 8 of article 1 of the constitution gives congress exclusive power to regulate commerce among the several states; and, when congress refrains from exercising that power in relation to any subject, commerce is free, and cannot be interfered with by the states. It was so held in Brown v. Houston, 114 U. S. 631, 5 Sup. Ct. 1091. In quite a number of subsequent cases the supreme court has held the same doctrine, in applying it to a constantly varying condition of facts."

Mr. Justice Bradley, sitting in circuit court, truly and aptly said in Stockton v. Railroad Co., 32 Fed. 17:

"The power of congress is supreme over the whole subject of interstate commerce, unimpeded and unembarrassed by state lines or state laws. On this matter the country is one, and the work to be accomplished is national; and state jealousies, state prejudices, and state interests do not require to be consulted. In matters of foreign and interstate commerce, there are no states."

I went on, in the Rebman Case, to say as follows (but I shall now use the word "health," instead of "inspection," whenever the latter occurred):

"It is undeniable that a state of this Union, like other self-governing states, has the power to enact health laws for the public safety. It has as clear a right to this power as it has to existence. It may enact and enforce health laws adapted to secure the public safety, even though they trench upon, and more or less obstruct, the freedom of trade between the states. It is equally true, however, that health laws, to be within the sovereign prerogative of the state, and to stand superior to the cardinal provisions of the national constitution, must be essentially and really such, in character, purpose, and operation. To call a law a health law does not make it one, competent to override any tenet of constitutional law. It must be a health law in spirit and in truth. It must be a reasonable law, properly devised for preventing the evil at which it is aimed; so devised as to no more than effectuate that purpose, and as not to subserve other objects not essential to the public safety. When health laws are abused for the latter ends, and thereby affect trade between the states obstructively or injuriously, it is competent for the national courts—it is declared to be our solemn duty—to pronounce them invalid, and to forbid their enforcement. And so it seems to me that the question at bar is resolved into the inquiry, whether or not the meat law of Virginia is reasonable and necessary, is directed against a dangerous evil, has an eye single to the prevention of that evil, and provides for its prevention in a manner less injurious to the constitutional rights of the citizens of our sister states than any other that could be devised."

In my construction of the Virginia meat act, I held that the negative of the propositions just stated was true of it, and held it, therefore, to be an invalid law, as against the products of sister states. I therefore released the petitioner, who had been imprisoned under that law. When the case was before the supreme court of the United States, that court, in affirming the judgment of this court, said of the Virginia meat law:

"We are of opinion that the statute of Virginia, although avowedly enacted to protect its people against the sale of unwholesome meats, has no real or substantial relation to such an object, but, by its necessary operation, is a regulation of commerce, beyond the power of a state to establish."

The Rebman Case is on all fours with the two now under consideration. On March 1, 1892, the general assembly of Virginia enacted a law whose title declared it to be "An act to prevent the adulteration of butter and cheese, and the sale of the same, and preserve the public health." [1]

Under this title the act went on to forbid the manufacture and sale of any compound made of substances other than such as are produced from cows' milk, and of any compound made of such other substances as were imitations or semblances of the products of cows' milk, and from coloring such other substances so as to make them similar to butter or cheese. Indeed, the very terms of the provisions of the act excluded the idea of the adulteration of butter and cheese. They referred exclusively to compounds of things other than butter and cheese. As oleomargarine is not composed in any ingredient of butter or cheese, it can be in no contingency or possibility an adulteration of these products of the cow. And so this act of Virginia, purporting to be an act to prevent the adulteration of butter and cheese, was no more nor less than an act to forbid the manufacture and sale of oleomargarine in the state. As

---

[1] Acts Gen. Assem. Va. 1891–92, p. 840:

An act to prevent the adulteration of butter and cheese and the sale of the same, and preserve the public health.

1. Be it enacted by the general assembly of Virginia, that no person shall manufacture out of any oleaginous substance or substances, or any compound of the same other than that produced from unadulterated milk or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk or cream of the same, or shall sell or offer for sale the same as an article of food. This provision shall not apply to pure skim milk cheese made from pure skim milk. Whoever violates the provisions of this section shall be guilty of a misdemeanor, and be punished by a fine of not less than fifty nor more than one hundred dollars for the first offence, and for each subsequent offence shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars.

2. That no person, by himself or his agents or servants, shall render or manufacture out of any animal fat or animal or vegetable oils not produced from unadulterated milk or cream from the same, any article in imitation or semblance of natural butter or cheese produced from pure, unadulterated milk or cream of the same, nor mix, compound with, or add to milk, cream or butter any acids or other deleterious substances or any animal fat or animal oils not produced from milk or cream so as to produce any article or substance or any human food in imitation or semblance of natural butter or cheese, nor sell, keep for sale, or offer for sale any article, substance or compound, made, manufactured, or produced in violation of the provisions of this section, whether such article, substance or compound shall be made or produced in this state or elsewhere. Whoever violates the provisions of this section shall be guilty of a misdemeanor, and be punished by a fine of not less than fifty nor more than one hundred dollars for the first offence, and for each subsequent offence shall be punished by a fine of not less than one hundred dollars nor more than two hundred and fifty dollars. Nothing in this section shall impair the provisions of the first section of this act.

3. That no person shall manufacture, mix, or compound with or add to natural milk, cream or butter any animal fats or animal or vegetable oils,

to the manufacture of oleomargarine, the law was without the necessary raison d'etre. None was manufactured in the state; none has been or is manufactured here; and, if the manufacture of it is an evil, it is one that did not exist, and as to which the act is brutum fulmen. Stripped of its verbiage, and of its useless inhibition of a nonexistent manufacture, the law is nothing more nor less than a prohibition of the sale in Virginia of oleomargarine imported from one of our sister states. It is in palpable conflict with the national constitution. It is a fact of common knowledge that oleomargarine has been subjected to the severest scientific scrutiny, and has been adopted by every leading government in Europe, as well as America, for use by their armies and navies. Though not originally invented by us, it is a gift of American enterprise and progressive invention to the world. It has become one of the conspicuous articles of interstate commerce, and furnishes a large income to the general government annually. Its chemical properties and preparation are such that it is adopted for the use of the armies and navies of the great nations as more desirable and safe than to run the risk of rancid butters and animated cheeses. It is entering rapidly into domestic use, and the trade in oleomargarine has become large and important. The attention of the national government has been attracted to it as a

nor shall he make or manufacture any oleaginous substance not produced from milk or cream, with the intent to sell the same for butter or cheese made from unadulterated milk or cream, or have the same in his possession, or offer the same for sale with such intent; nor shall any article, substance or compound so made or produced be sold, intentionally or otherwise, as and for butter or cheese the product of the dairy; no person shall coat, powder, or color with annotto or any coloring matter whatever, butterine or oleomargarine or any compound of the same, or any product or manufacture made in whole or in part from animal fats or animal or vegetable oils not produced from unadulterated milk or cream, whereby the said product, manufacture or compound shall resemble butter or cheese the product of the dairy, or shall have the same in his possession with the intent to sell the same, or shall sell or offer the same for sale. Whoever violates any of the provisions of this section shall be guilty of a misdemeanor, and be punished by a fine of not less than fifty nor more than one hundred dollars for the first offence, and shall be punished by a fine of not less than one hundred dollars nor more than two hundred and fifty dollars for each subsequent offence. This section shall not be construed to impair or affect the prohibition of sections one and two of this act.

4. That no keeper or proprietor of any bakery, hotel, tavern, boarding house, restaurant, saloon, lunch-counter or place of public entertainment, or any person having charge thereof or employed thereat, shall keep, use or serve therein, either as food for their guests, boarders, patrons or customers, or for cooking purposes, any article made in violation of the provisions of sections one, two and three of this act. Whoever violates the provisions of this section shall be guilty of a misdemeanor and punished by a fine of not less than fifty nor more than one hundred dollars for each offence.

5. That the authority to impose such fines, with costs, as are enumerated in sections one, two, three and four of this act shall vest in the same court that exercises jurisdiction of other criminal cases.

6. That all acts or parts of acts, so far as they conflict with the provisions of this act, are hereby repealed.

7. This act shall be in force from its passage.

Approved March 1st, 1892.

source of revenue. Its manufacture and sale have been made the subject of careful regulation by congress, and the national revenue derived from it is considerable. Manufacturers pay a tax of $600 per annum; wholesale dealers, $480; and retail dealers, $48. These petitioners had paid these taxes to the United States, which were heavy, and were doing business under the imprimatur of the national government; and it was for doing that business that they were arrested, tried, and jailed in this city of Norfolk. State legislation against it is therefore regarded as invidious by the national authorities, and the right of dealing in it will not be allowed by them to be capriciously overthrown. Provincial prejudice against this now staple article of commerce is natural, but a city of the size and prospects of Norfolk as a world's entrepot ought not to be foremost in manifesting such a prejudice. My recollection is that there were no prosecutions under the meat act anywhere in the state, except in Norfolk. I regret that it has been necessary to bring such cases as those at bar before me. I regret that the necessity for doing so has arisen in Norfolk; the criminal court of Richmond having refused to entertain such prosecutions, holding the act of March 1, 1892, obnoxious to the state constitution, as I hold it to be obnoxious to the national constitution. I think it is palpably obnoxious to both.

I will enter judgment for the petitioners, and order them to be released from custody. If appeal is desired, they may be bailed to await the judgment of the supreme court at Washington. If an appeal is taken, the case will be accorded there a privileged hearing; and I will facilitate, as far as I can do so, the appeal and an early hearing.

Although unnecessary, I will append here a notice of the recent decision of the United States supreme court in the case of Plumley v. Com., 15 Sup. Ct. 154. In that case the court had under review a statute of Massachusetts prohibiting the sale in that state of oleomargarine if it was got up "in imitation of yellow butter," but allowing it to be sold "in a separate and distinct form, and in such a manner as will advise the consumer of its real character, free from coloration or ingredient that causes it to look like butter." The supreme court held that, though the act would have been invalid if it had prohibited the sale of oleomargarine generally in undisguised form, yet that so far as it prohibited the coloring of oleomargarine yellow, so as to imitate butter, and thereby deceive the consumer, the law was pro tanto valid. Even in restricting its decision to the mere yellowing of oleomargarine, the court was held, by three of the justices, to have gone too far. The court were unanimous as to the invalidity of any state law which should inhibit the sale within its borders of oleomargarine, when prepared, labeled, and sold as such, without deceit or fraud. Such is the case as to the article for selling which the petitioners now before me have been prosecuted, and the case of Plumley v. Com. is authority and warrant for my order setting them at liberty.