[No. 934. September 14, 1904.]

# TERRITORY ex rel. E. J. McLEAN & COMPANY, Appellants, v. THE DENVER & RIO GRANDE RAILROAD COMPANY, Appellee.

## SYLLABUS.

1. The only limitation requiring uniformity of taxation in the territories is contained in the fourteenth amendment of the federal Constitution, guaranteeing equal protection of laws which is satisfied by a tax imposed on a part of the communtiy based on a reasonable and just classification of taxpayers.

·2. Laws 1901, p. 96, c. 45, requiring hides of animals killed at slaughter houses to be kept for 30 days free to inspection of the cattle sanitary board, but now nowhere requiring any person to visit any place for the purpose of inspecting hides except slaughter houses, and requiring them to he inspected once every 30 days, for which a charge of 10 cents a hide is required to be paid by the owner, was not an exercise of the general taxing power of the Territory, since it did not attempt to levy a tax on the hides of animals in general killed within the State, but of the police power.

3. Laws 1901, p. 96, c. 45, section 3, prohibiting the transportation beyond the limits of the Territory of any hides not inspected and tagged, for which a fee of 10 cents a hide was permitted, was not objectionable, as a violation of the federal Constitution; ar.. 1, section 10, prohibiting any State, without the consent of Congress, to lay duties on exports, in so far as it applied to the shipment of hides within the United States.

4. Constitution United States, art. 1, section 10, providing that no State shall, without the consent of Congress, lay any duties on imports or exports, except what may be necessary for executing its inspection laws, and containing provisions for the payment of fees for carrying the same into effect, is applicable to interstate commerce.

5. Laws 1901, p. 96, c. 45, providing for the inspection of the hides of animals killed at slaughter houses, permitting a fee of 10 cents a hide to be charged therefor against the owner, and prohibiting any railroad company from shipping hides not inspected and tagged beyond the limits of the Territory, was valid as an inspection law, though its purpose was not to improve the quality of the hides, etc., but was for the sole purpose of aiding in the detection and punishment of crime or fraud against the cattle industry.

6. Since a part of the fees collected for the inspection of hides fixed by Laws 1901, p. 96, c. 45, sections 3, 4, are applicable

to the payment of expenses incurred by the cattle sanitary board as provided by Compiled Laws, sections 220, and the secretary of such board has various other duties to perform than those pertaining to the business of inspecting hides, a showing that the cost of such inspection was much less than the amount authorized to be charged by section 3 was insufficient to establish the invalidity of the statute on the ground that the fees provided were beyond the requirements of inspection.

7. Laws 1901, p. 96. c. 45, sections 3, 4, providing for the inspection of hides, and authorizing a charge of 10 cents a hide against the owner for such inspection, do not apply to pelts and skins.

Appeal from the district court of Santa Fe county, before JOHN R. MCFIE, Associate Justice. Affirmed.

CATRON & GORTNER and W. B. CHILDERS for appellants.

EDWARD L. BARTLETT and CHARLES A. SPIESS for appellee.

This is not an inspection law within the meaning of the exception found in the Constitution of the United States, art. 1, sec. 10, par. 2. All such laws must be subject to the revision and control of Congress.

> Gibbons v. Ogden, 9 Wheat. 1203; Turner v. Maryland, 107 U. S. 38-55; Gibbons v. Ogdon, 107 U. S. 49-50.

All definitions of inspection laws preclude any purpose which can be accomplished by this New Mexico statute.

> Burrill's Law Dictionary; Bouvier's Law Dictionary; Clintsman v. Northop, 8 Cow. (N. Y.) 45; 16 Am. and Eng. Ency. of Law, 808, and note; Hannibal & St. Joseph Railroad Co. v. Husen, 95 U. S. 465; Thorp v. Railroad Co., 27 Vt. 149.

A state cannot make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease and to cure the sick, an inspection law,

within the constitutional meaning of that word, by calling it so in the title.

> People v. Campagnie Gen. Translantique, 107 U. S. 62; Bowman v. Chicago, etc., Ry. Co., 125 U. S. 465; The License Cases, 5 How. 504-599; Leisey v. Hardin, 135 U. S. 112.

The power to tax is the power to prohibit and destroy.

> McCullough v. Maryland, 4 Wheaton 316; Voight v. Wright, 114 U. S. 65; 1 Tucker on the Constitution, 77; Loan Assn. v. Topeka, 20 Wall. 665; Turpin v. Burgess, 117 U. S. 504; Kidd v. Pearson, 128 U. S. 1.

Property and persons once within a state are subject to local police regulations, and such regulation is not an interference with interstate commerce.

> Wabash Ry. Co. v. Ill., 118 U. S. 557, 575; Lindsay v. Mullen, 176 U. S. 126; County of Mobile v. Kimball, 102 U. S. 691; Gloucester Ferry Co. v. Penna., 114 U. S. 196; Coe v. Errol, 116 U. S. 517-525; Brummer v. Redman, 138 U. S. 78; Walling v. Michigan, 116 U. S. 446; Voight v. Wright, 141 U. S. 966; Lawton v. Steele, 152 U. S. 137; Henderson v. New York, 92 U. S. 259; Railroad Co. v. Husen, 95 U. S. 465; Chy Lung v. Freeman, 92 U. S. 275; Lake Shore & M. S. Rd. Co. v. Ohio, 173 U. S. 300; Mugler v. Kansas, 123 U. S. 623; See, also, Nelson v. Garza, 2 Woods 287; 17 Fed. Cases No. 10091; Patapsco Guano Co. v. N. Carolina, 171 U. S. 345; Am. Fert. Co. v. Board of Agriculture, 43 Fed. Rep. 613.

When the tax imposed is diverted to any other purpose than for what may be absolutely necessary for executing the inspection laws, the statute is void. It then becomes a revenue law and not an inspection law.

Cases last above cited and In re Rebman, 41 Fed. Rep.

The doctrine that the presumption is to be indulged and the doubt given to the statute, is not the true doctrine. The Constitution is as sacred as the territorial statute.

Lake Shore, etc., Ry. Co. v. Ohio, supra; Ry. Co. v. Husen, supra; Mugler v. Kansas, supra.

A statute may be void by reason of its operation, although valid on its face.

Virginia Coupon Cases, 114 U. S. 295.

OPINION OF THE COURT.

PARKER, J.—On the seventh day of September, A. D., 1901, Levi A. Hughes, agent of E. J. McLean & Company, of Denver, Colorado, offered for shipment over the defendant company's railroad, one bale of dry hides, weighing 970 pounds, and containing twenty-nine steer hides and seventeen cow hides, consigned to E. J. McLean & Company, Denver, Colorado, and delivered same upon the depot platform of said railroad company, at Santa Fe, New Mexico, for transportation from Santa Fe to Denver. T. J. Helm, general agent of said railroad company, acting for the company, declined to receive or transport the hides, outside of the limits of the Territory for want of evidence that the hides offered for shipment had been inspected as required by the laws of New Mexico. That the hides in question had not been inspected as required by sections three and four of chapter 45 of the Session Laws of 1901, or inspected under any laws of the Territory, is admitted for the purpose of this case. Relator sued out an alternative writ of mandamus, commanding said railroad company to receive and transport the hides offered, or to show cause why it had not done so. On the return day

the defendant railroad company moved to quash the writ for the reason that the petition for the writ did not state a cause of action. Hearing was had upon the petition, writ, and motion to quash, and the writ was quashed and cause dismissed. Thereupon an appeal was sued out to this court by the relator.

It is conceded by counsel that consistent statutes relating to the same subject-matter, though enacted at different times, are treated prospectively, and are considered as one act. U. S. v. Freeman, 3 How. 556; South., Stat. Con., sec. 288. The first act relating to inspection of hides was passed in 1884, and provided that all butchers should keep a record of all animals slaughtered, and keep the hides and horns of such animals for thirty days after slaughter free to the inspection of all persons (Compiled Laws, section 84), and provided a penalty for failure to keep the record and the hides and horns (section 86), and a penalty for refusal of inspection of the record or hides (section 87). In 1891, all persons were required to keep hides for thirty days for the inspection of any sheriff, deputy sheriff, or any constable, or any board or inspector, or any officer authorized to inspect hides (section 89), and provided a penalty (section 90). In 1889, amended in 1895, a cattle sanitary board was created (section 183), with power to adopt and enforce quarantine regulations and regulations for the inspection of cattle for sale and slaughter (section 184), and to pay inspectors not to exceed $2.50 per day and their expenses (section 190). In 1891, the cattle sanitary board was authorized and required to make regulations concerning inspection of cattle for shipment, and hides and slaughterhouses (section 208), and there was provided the details of arrangement for inspection of cattle (section 212), and the duties of cattle inspectors were enlarged by provid-

ing: "Every slaughterhouse in this Territory shall be carefully inspected by some one of the inspectors aforesaid, and all hides found in such slaughterhouses shall be carefully compared with the records of such slaughterhouses, and a report in writing setting forth the number of cattle killed at any such slaughterhouse since the last inspection. . . . the names of the persons from whom each of said cattle was bought, the brands and marks upon each hide, and any information that may be obtained touching the violation by the owner of any such slaughterhouse, or any other person, of the provisions of an act entitled 'An act for the protection of stock and for other purposes,' approved April 1, 1884.  For the purpose of making the inspection authorized by this act, any inspector employed by the said sanitary board shall have the right to enter in the day or nighttime any slaughterhouse or other place where cattle are killed in this Territory and to carefully examine the same, and all books and records required by law to be kept therein, and to compare the hides found therein with such records" (section 213).  In 1893 it was provided that the cattle sanitary board might fix fees for the inspection of cattle and hides (section 221, repealed in 1889), and that such fees shall be paid to the secretary of the board and placed to the credit of the cattle sanitary board (section 222), and shall be used, together with funds realized from taxes levied and assessed or to be levied and assessed upon cattle only, to defray the expenses of the board (section 220).   Chapter 44 of the Laws of 1899 makes no changes in the law material to the consideration of this case.  Chapter 53 of the Laws of 1899 provides a fee of three cents for inspection of cattle.   Then follows the act complained of, the pertinent provisions whereof are sections three and four, chapter 45, of the Laws of 1901, which are as follows:

"Section 3.   Hereafter it shall be unlawful for any person, firm or corporation to offer, or for any railroad

company, or other common carrier to receive, for the purpose of shipment or transportation beyond the limits of this Territory, any hides that have not been inspected and tagged by a duly authorized inspector of the cattle sanitary board of New Mexico, for the district in which such hides originate. For each hide thus inspected there shall be paid by the owner or holder thereof, a fee or charge of ten cents, and such fee or charge shall be a lien upon the hides thus inspected, until the same shall have been paid. Each inspector of hides shall keep a complete record of all inspections made by him, and shall at once forward to the secretary of the cattle sanitary board, on blanks furnished him for that purpose, a complete report of each inspection, giving the names of the purchaser and shipper of the hides, as well as all the brands thereon, which said report shall be preserved by the secretary as a part of the records of his office."

"Section 4. Any person, firm or corporation, common carrier, railroad company or agent thereof, violating any of the provisions of this act, or refusing to permit the inspection of any hides as herein provided, shall upon conviction thereof, be deemed guilty of a misdemeanor and shall be fined in any sum not exceeding one thousand dollars for each and every violation of the provisions of this act."

Defendant attempts to justify the act in question under the general taxing power of the Territory. If it be true, as contended by defendant, that every hide produced in the Territory of New Mexico is by law subjected to the payment of the tax of ten cents, we can see no constitutional objection to the law. The limitation upon the taxing power as to equality and uniformity of taxation has its foundation in State Constitutions. The only limitation in Territories applicable to the question at issue in this case is contained in the fourteenth amendment to the Constitution of the

United States, which guarantees among other things, to all persons the equal protection of the laws. This guaranty, it seems, is not quite the exact equivalent of equality and uniformity as used in State Constitutions. Given a reasonable and just classification of taxpayers, all that the fourteenth amendment of the Constitution of the United States guarantees is that all in the class shall be treated alike. Giozza v. Tiernan, 148 U. S. 657. If, then, the legislative department of the government of the Territory has determined that the owners of cattle in the Territory of New Mexico ought in justice and in order to bear their just and fair share of the public burdens to pay a tax of ten cents per head upon each animal slaughtered in the Territory, and has so provided by statute, we can see no reason why such legislation must not be upheld. But an examination of every section of the statute relating to the subject under discussion fails to convince us that the Legislature has so provided. It is true that every person killing a bovine animal in New Mexico, is required by law to keep the hide for thirty days free to the inspection of the cattle sanitary board, but nowhere can there be found any requirement of law for any inspector or person to visit any place for the purpose of inspection of hides ' except slaughterhouses. It is provided in the statute that slaughterhouses shall be inspected once every thirty days, and we assume that the inspector is authorized, under section three of the act of 1901, to charge therefor the sum of ten cents. But it is not made his duty to visit and inspect hides in any other place or places in the Territory. While it is true that the individual is required to keep the hide for thirty days, so as to permit inspection, it is entirely optional, so far as any requirement of law is concerned, with the inspector, as to whether he visits any place except a slaughterhouse. It is a matter of common knowledge that large numbers of cattle are killed in this Territory by people not in slaughterhouses, and it cannot be said, therefore, that a

tax of ten cents per hide is levied upon each hide in the Territory. No intention, therefore, of the Legislature to tax hides of animals killed in places other than slaughterhouses, and not intended for export, can be drawn from the various statutes on the subject.

The power, then, which the Legislature has sought to exercise must be attributed, not to the general taxing power, but to the police power; and this brings us to the second and more important point in this case, and that is, whether the act of 1901, taken in connection with all the other legislation upon the same subject, is a valid inspection law. It is urged that this statute is void, by reason of its antagonism to sections 8 and 10 of article 1 of the Constitution of the United States. In the first place it is to be observed that the facts in this case do not present the situation of a burden being imposed upon commerce with a foreign country. This being so, the burden is not prohibited by section 10 of article 1 of the Constitution. Woodruff v. Parham, 8 Wall (U. S.) 123; Brown v. Huston, 144 U. S. 622. This section contains the only grant or reservation in the Constitution of power to the States to enact inspection laws, and has reference only to commerce with a foreign country; but the same reason exists for the power to enact inspection laws applicable to interstate commerce, and this power is admitted to be possessed by the States. Patapsco Guano Co. v. North Carolina Board of Agriculture, 171 U. S. 345, 354, 361; In re Rebman, 41 Fed. 867, 874. The first objection to this law, treated as a police regulation, is that it fails to meet the requirements of an inspection law at all, as contemplated by the constitution and interpreted by the courts. Inspection was first defined by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 203, as follows: "The object of inspection laws is to improve the quality of articles produced by the labor of a country; to fit them for exportation; or, it may be, for

domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces everything within the territory of a State, not surrendered to the general government; all which can be most advantageously exercised by the States themselves." In Turner v. Maryland, 107 U. S. 38, 55, it was said: "Recognized elements of inspection laws have always been quality of the article, form, capacity, dimensions, and weight of package, mode of putting up, and marking and branding of various kinds, all these matters being supervised by a public officer having authority to pass or not pass the article as lawful merchandise, as it did or did not answer the prescribed requirements." In Foster v. New Orleans, 94 U. S. 246, it is said: "The object of such laws is to certify the quantity and value of the articles inspected, whether imports or exports, for the protection of buyers and consumers." In Clintsman v. Northrup, 8 Cow. 46, it is said: "The object of those laws is to protect the community, so far as they apply to domestic sales, from frauds and impositions; and in relation to articles designed for exportation, to preserve the character and reputation of the State in foreign markets." It would appear from these definitions that some element of quality, quantity, form, size, weight, etc., of the article inspected, designed for the protection of the consumer of the article or the reputation of the State wherein it originates, has always been deemed essential. However, the Supreme Court, in Voight v. Wright, 141 U. S. 63, expressly declines to limit the scope of valid inspection laws, leaving the matter to each case as it may arise. In People v. Campaigne Gen. Transatlantique, 107 U. S. 59, 63, it is said: "A State can not make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease, and to cure the sick, an inspection law, within the constitutional meaning of

that word, by calling it so in title." But this statement
is to be taken in connection with the facts in that case,
and not to announce a principle of universal applica-
tion. In that case the tax was levied on immigrants,
not property, and the law was held unconstitutional for
that reason.

Assuming that the only reason or excuse for the law
in question, is the fact that it is designed to aid in the
detection and punishment of crime or fraud against
the cattle industry of the Territory, as is claimed
on argument by counsel for relator, the question is
whether this is a proper end to be subserved by an
inspection law. It is certainly a wide departure from
original definitions to include such a law within them.
But in Neilson v. Garza, 2 Woods (U. S.) 287, Bradley,
Circuit Justice, a case which is often cited, and which
has never, so far as we are aware been criticised, just
such a law as the one under consideration was sus-
tained. In that case the complainant resided in Mata-
moras, Mexico, and was engaged in importing hides
from that place to Brownsville, Texas, and thence to
New York. He was subjected by the laws of Texas to
the payment of an inspection fee of from six to ten
cents per hide by the inspector of the county into which
the hides were imported, and of which he complained.
The section under which the fee was exacted was a part
of a general statute requiring all hides and animals do-
mestic and foreign, to be inspected before they could be
exported. The court said: "The exporter must ob-
tain the certificate of the inspector, or his deputy, of the
county into which the hides were imported, certifying
(note what things are to be certified); the date of the im-
portation, the name of the importer and of the owner,
and of the person in charge, name of the place where im-
ported, number of hides and animals imported, and de-
scription of their marks and brands, if any there be, by
which they can be identified.

"What is this but inspection? The party is to sub-

ject the hides or animals to the examination of the official inspector, that he may note everything about them, serving to their identification, ownership, etc.

"I do not say that such an inspection as this is necessary or expedient; but it is inspection; and at such a place as Brownsville, it may, for aught I know, be necessary police regulation to prevent frauds and clandestine removal and exportation of property belonging to the people of Texas."

It is here unequivocally announced that a police regulation for the ascertainment of the ownership of animals and hides and to prevent frauds or crimes in connection with such property, may properly be enforced by means of an inspection law. The law, so far as it related to domestic hides, was not drawn in question; but evidently it would be held valid for the same reasons assigned as to the foreign hides. It would be as competent to prevent by an inspection system frauds and crimes against property of this kind which had always remained in the State, as to so prevent frauds and crimes against property which had been removed from the State of Mexico and then reimported into the State, because the same necessities, by reason of the character of the property, the methods of producing the same, the facilities of committing frauds and crimes against the same, would exist in both cases in nearly or quite the same degree.

We therefore hold that it is competent by an inspection law to enforce a police regulation calculated and suited to prevent frauds and crimes against the cattle industry of the territory.

Further objection is made by the relator on the ground that the inspection fees are beyond the requirements for inspection. This objection, standing alone is not well founded. If the amount of money raised by an inspection system proves to be larger than is required for the purpose, it is to be presumed that the Legislature will decrease the charge. And so long as

the inspection fee is not so much in excess of what appears to be reasonably required for the inspection as to change the character of the act and make it appear to be an act designed for revenue instead of regulation, the same presents no judicial question. Petapsco Guano Co. v. North Carolina Board of Agriculture, 171 U. S. 345. But this objection, taken in connection with the further objection by the relator 'that the fund realized by the inspection provided for by the act, are by law provided to be and are used for purposes other than paying the expenses of inspection, raises a most serious question in the case. Section 220 of the Compiled Laws provides as follows:

"In order to provide the necessary moneys for the payment of the expenses incurred by the cattle sanitary board of New Mexico, in the execution of the provisions of an act entitled 'An act in relation to live stock,' approved February 14, 1891, the said board shall have power to borrow money and to issue negotiable paper therefor; but the indebtedness so created shall not at any time exceed the sum of five thousand dollars, and any indebtedness so created shall be paid out of revenue accruing to the cattle indemnity fund from taxes levied and assessed or to be levied and assessed upon cattle only, and from fees arising from inspection of cattle and hides as hereinafter provided, and not otherwise."

Of course if it be true that no more money is raised by this inspection system than is required to pay the legtimate expenses of such inspection, then no one has been harmed. But, on the other hand, if it be true that more money is raised than is required, and that the surplus is permitted to be applied, by section 220, to the payment of the other expenses of the cattle sanitary board not connected with the inspection, the tax becomes a burden upon interstate commerce and cannot be sustained. In the first place, it is to be noted that section 220 provides that the board shall be supported, from, among other sources, "fees arising from inspection of cat-

tle and hides as hereinafter provided," and it may well be doubted whether this is not a limitation on the diversion of fees for hide inspection to such fees as might have been collected under the provisions of section 221, prior to its repeal the two sections being a part of the same act. If so, section 220 would not divert any fees collected under the act of 1901 under consideration. But assuming that section 220 does authorize diversion of fees collected under the latter act, the question is whether the allegations of relator are sufficient to question the constitutionality of the act. The allegation on the subject is contained in specification "I" of the writ and is as follows:

"I. That said pretended fee or charge is largely in excess of the amount of fee or charge which might be absolutely necessary for the making of an inspection such as is required by said pretended enactment, it being the fact that hides as aforesaid are gathered for exportation in carload lots, in the said towns of Albuquerque, Santa Fe, and Las Vegas, and that shipments are made from said points about twelve to fifteen times per year, on an average; that at such times there are on hand for shipment large numbers of hides, varying from 1000 to 3000, and that the same can be inspected at the rate of at least 400 per day, before being baled and compressed for shipment as hereinafter stated; that at such rate of inspection the amount of such inspection would be at least forty dollars per day, whereas the fees and compensation of an inspector of the cattle sanitary board are fixed by law at $2.50 per day and necessary expenses, which said expenses could not exceed $5.00 per day in the discharge of his duties."

It thus appears that relator founds his whole objection to the excess of fees upon the fact that an inspector can earn more per day than, by any possibility, his per diem and expenses could cost. It is clearly overlooked, however, that the salary and expenses of an inspector may, and probably do, form a comparatively small pro-

portion of the cost of inspection. Records must be made, a secretary of the board must be paid, office records must be provided. The relator by the most liberal construction of his pleading cannot be held to have alleged that the fees collected are in excess of the requirements for all of these purposes and they all seem to be clearly legitimate expenses of the inspection.

We take notice of the statutes of the Territory which provide for and authorize the maintenance of the office of secretary of the cattle sanitary board, and that, as such the said officer has various other duties to perform than those which pertain to the business of inspection of hides. But the court is not furnished by the writ in this case with any information as to what proportion the business of attending to the inspection of hides bears to the whole business of the secretary of the board. We cannot see, therefore, from the allegations in the writ that the legitimate expenses of the hide inspection are not equal to the amount of fees collected. It has already been seen that the hearing in this case in the court below was had upon the petition, writ and motion to quash the writ. The motion to quash the writ was the equivalent of a demurrer and, of course, admitted the facts stated in the petition. In determining as a matter of law that the writ failed to state a cause of action, we think the court below committed no error, it nowhere appearing from the allegations that the fees collected are in excess of the actual requirements for the enforcement of the law.

Further objection is made by relator to the effect that the tax of ten cents is excessive and practically prohibitive, for the reason that the tax of ten cents is in many cases more than the original value of the hide. It will, however, be observed that the word hide alone is used in the act of 1901, and a distinction between hides and pelts and skins is recognized in some of the sections of the statutes. This statute has no application to pelts or skins, and these pelts and

skins we assume are what is referred to in the petition as being of less value than the charge of ten cents.

Objection is made by relator that the said inspection law is impracticable, in that no provision is therein made to compel an inspector to promptly inspect hides intended for shipment, and that thereby great delays, embarrassment and loss result to the relator. This contention is not argued in the brief, and we will not therefore consider the same at this time.

For the reasons assigned, the judgment of the court below should be affirmed, and it is so ordered.

Mills, C. J. and Pope, A. J., concur.

Baker, A. J., dissents.

Mann, J., not having heard argument, did not participate herein, nor did McFie, A. J., having tried the case below.

POPE, J. (concurring).—While I do not regard as tenable the position of the appellee, that the hides here involved were at the time and place named in the writ, not articles of interstate commerce and that they were thus not within the protection afforded by the interstate commerce clause of the Constitution, I am of opinion that the fee imposed was a valid requirement in the exercise of the police power of the Territory and thus not within the prohibition against the regulation of interstate commerce by the States. The right of the Territory in the exercise of its police power, to exact a proper fee for inspection in cases such as this, is pointed out very clearly in the opinion of the court. It is contended by the relator, however, that, even assuming this power, the recitals of the writ taken as true upon the motion to quash show the fee imposed to be excessive and also show that the Legislature has diverted a portion of the proceeds to purposes foreign to the ends of the inspection, and that the law thus becomes in effect a revenue measure instead of an inspection charge and is void as an improper burden upon interstate commerce.

It is upon this particular contention that I desire by this concurring opinion to record a brief review of the authorities.

The charges which inspection laws impose must be such "as merely defray the expense of executing the inspection" (In re Rebman, 41 Fed. 875), but to render a law void because of excessiveness of the fee there must be either such excessiveness as "to shock the conscience." (Patapsco case, 52 Fed. 690) and to demonstrate that the Legislature under the guise of an inspection law was levying a tribute upon interstate commerce, or there must be created by the law imposing the fee some diversion of the funds from the expenses of inspection to other directions, thus evidencing a legislative purpose to misuse the funds. In either case the legislative intent, presumed from the excess in one instance and evidenced by its express language in the second, stamps the law as a mere sham, a creator of revenue under the guise of a statute for inspection. An instance of the first class of law is found in the recent case of Postal Telegraph Co. v. Taylor, 192 U. S. 71, where upon a showing that the fee charged for supervision and inspection was twenty times the amount that would be expended for the purpose, the court held that it was impossible by "the widest stretch of imagination" to regard the fee as reasonable and it was declared void as "a mere subterfuge for the purpose of raising revenue."

Instances of the second class are found in Amer. Fert. Co. v. Board of Agriculture, 43 Fed. 613 where the Legislature appropriated thousands of dollars derived from so-called inspection fees to purposes entirely foreign to the expense of such inspection and the statute was declared void and also In re Rebman, 41 Fed. 875, where the law was declared void because "half of the moneys paid for inspection were given to the inspectors and the other *half ordered into the treasury.*" Is this law void under either of these lines of authority? The

first which is a question of fact, must be determined by the allegations of the writ, taken as confessed; the second, which is a matter of law, by the wording of the statute. The only allegations of the petition on this subject are found in paragraph "I" of the writ, where it is in effect said that "the pretended fee or charge is largely in excess of the amount of fee or charge which *might* be absolutely necessary for the making "of the required inspection, and where the relator goes on further to allege that under certain circumstances the inspector could make forty dollars per day when his fees and expenses would amount to only five dollars per day. I cannot consider this allegation of what an inspector under the most favorable circumstances *could* make upon a given day as the equivalent of an allegation that the proceeds of the system of hide inspection taken in the aggregate and for a stated period, are in excess of the amount necessary to defray the expenses of that system for such period. Relator's position overlooks the fact that there may be days when the inspector inspects only a few hides instead of 400, and yet with the same expenses and per diem. It overlooks the fact also that the mere expenses and per diem of the inspector is not all that is chargable against the fees collected. The system provides for blanks to be printed, tags to be furnished, data to be forwarded to the office of the cattle sanitary board and an office force there employed to enter such data and preserve the same. It will thus be seen that the fact that one or more inspectors *might* upon a given day make forty dollars, when their personal expenses and compensation are much less, is not equivalent to an allegation that the fees charged are in excess of the aggregate cost of such inspection from year to year. As was said in Cherter City v. Telegraph Co., 154 Pa. St. 464 (Quoted with approval in Western Union Telegraph Co. v. New Hope, 187 U. S. 425), where it was averred in the affidavit of defense that the rates charged were at least five

times the amount of the expense involved in the supervision exercised by the municipality.

"For the purpose of this case, we must treat this averment as true as far as it goes. The difficulty is it does not go far enough. It refers only to the usual ordinary or necessary expenses of municipal officers, of issuing licenses and other expenses thereby imposed upon the municipality. It makes no reference to the liability imposed upon the city by the erection of telegraph poles. It is the duty of the city to see that the poles are safe and properly maintained, and should a citizen be injured in person or property by reason of a neglect of such duty an action might lie against the city for the consequences of such neglect. It is a mistake, therefore, to measure the reasonableness of the charge by the amounts actually expended by the city for a particular year, to the particular purpose specified in the affidavit."

Coming now to the second point as to whether there is any legislative misappropriation of the funds derived from these inspections the attention of the court has been called by paragraph "J" to Compiled Laws, section 220, which it is alleged diverts the funds arising from "the inspection of hides" to the payment of notes issued from time to time to aid in the execution of the provisions of the act approved February 14, 1891. It is alleged that this is a diversion of the funds in question and renders the law void. It would seem that the words "Fees arising from inspection of cattle and hides as *hereinafter provided*," as used in section one of chapter 67 of the Laws of 1893, compiled as section 220 refer only to the fees provided for in section 2 and not to fees provided for by the act of 1901, passed eight years later, and in this view of the matter the fees here in question were not by said statute made subject to the payment of the negotiable paper authorized under the Compiled Laws, section 220. But assuming that such fees were directed to be so used, was this a diversion of such fees

from their legitimate purpose?   The law of February 14, 1891, referred to in section 220, empowers the cattle sanitary board among other things (section 208) to make "all necessary rules and regulations respecting the inspection of hides and slaughterhouses of this Territory and for the government of all employees of said sanitary board."   It also regulates the duties of inspectors (section 213), and provides for the salary of the secretary and other employees of the board.   It thus appears that this act creates fees and expenses which are a legitimate charge against the fees collected under the act of 1901, for, as we have above seen, the inspectors and the secretary of the board constitute an important part of the machinery required for the inspection under that act.   Using the money to aid in the execution of the act of 1891, is thus not necessarily a diversion of the funds raised by the act of 1901.   As above pointed out there is no sufficient allegation of any excess in the fees chargable under the act of 1901 over the expenses of inspection, so there is no ground for the assumption that section 220 effects a diversion of the funds.   For ought that appears to the contrary, all the funds collected under the law of 1901, are used in paying that portion of the expenses of the board properly chargeable against the inspection provided for by that act.   The fact that the funds collected under the act of 1901, are covered into the general funds of the cattle sanitary board does not affect the case.   That was true in the Patapsco Case, 52 Fed. 696, and is a mere matter of bookkeeping.

I am of opinion that the judgment should be affirmed.