RED C. OIL MFG. CO. v. BOARD OF AGRICULTURE et al.

(Circuit Court, E. D. North Carolina. September 7, 1909.)

1. CONSTITUTIONAL LAW (§ 68*) — VALIDITY OF STATE LAWS — REVIEW BY COURTS.

While the Legislature of a state is primarily vested with power to enact inspection laws, and to say what articles of commerce shall be brought within their provisions, the question whether in a given case the sale or use of the article bears any reasonable relation to the public morals, health, or safety so as to bring its regulation within the police powers of the state is of necessity a judicial question.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 125; Dec. Dig. § 68.*]

2. CONSTITUTIONAL LAW (§ 48*) — LIMITS OF LEGISLATIVE AUTHORITY — PRESUMPTION.

If a statute may or may not be, according to circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

3. COMMERCE (§ 50*)—INTERSTATE COMMERCE—INTERFERENCE BY STATE LAWS— INSPECTION OF KEROSENE OIL.

A state statute providing for the inspection and testing of kerosene oil sold for use in the state for illuminating purposes is within the police powers of the state, and is not unconstitutional as an interference with interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 48–53; Dec. Dig. § 50.*

Inspection, quarantine and sanitary regulations interfering with interstate commerce, see note to Smith v. Lowe, 59 C. C. A. 191.]

4. COMMERCE (§ 77*)—POWER TO IMPOSE LIMITATION—FEDERAL CONSTITUTION— TAX ON IMPORTS.

Article 1, § 10. Const. U. S., providing that "no state shall, without the consent of Congress lay any impost or duty on any imports or exports, except what may be absolutely necessary for executing its inspection laws," applies only to articles imported from foreign countries, or exported to them, and not to articles of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 61–70; Dec. Dig. § 77.*]

5. INSPECTION (§ 1*)—VALIDITY OF STATE LAWS—INSPECTION FEES.

While a state may not tax interstate commerce, it may, in the exercise of its reserved police power, impose such a reasonable charge or tax as is necessary to execute its inspection laws, and the amount of such charge or tax cannot be held excessive by the courts so as to invalidate the law,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

unless so unreasonable and disproportionate to the service rendered as to impeach the good faith of the law.

[Ed. Note.—For other cases, see Inspection, Cent. Dig. § 1; Dec. Dig. § 1.*]

6. INJUNCTION (§ 137*) — PRELIMINARY INJUNCTION — RESTRAINING ENFORCEMENT OF STATUTE.

A preliminary injunction to restrain the enforcement of a statute on the ground of its invalidity will not be granted unless it is quite clear that the statute cannot stand, or that there is great danger of irreparable injury.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307, 309; Dec. Dig. § 137.*]

7. CONSTITUTIONAL LAW (§ 47*)—STATUTES (§ 216*)—DETERMINATION OF VALIDITY—SCOPE OF INQUIRY.

The opinions of individual members of a legislative body expressed in the discussion of a bill as to its construction or probable effect cannot affect the judgment of a court in determining its validity or its construction where its language is free from doubt.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 43, 45; Dec. Dig. § 47;* Statutes, Cent. Dig. § 292; Dec. Dig. § 216.*]

8. COMMERCE (§ 51*)—CONSTITUTIONAL LAW (§ 62*)—NORTH CAROLINA OIL INSPECTION LAW—VALIDITY.

Act N. C. March 8, 1909 (Laws 1909, p. 911, c. 554), providing for the inspection and testing of illuminating oils sold or offered for sale in the state, imposing a tax of one-half cent per gallon on such oils to defray the expenses of such inspection and testing, and empowering the State Board of Agriculture to make rules and regulations therefor such as "they may deem necessary to provide the people of the state with satisfactory illuminating oil," is within the police powers of the state, and is not unconstitutional as an interference with interstate commerce, nor because the charge made is so excessive as to show it to be a revenue, and not an inspection statute; nor is it in violation of article 2, § 1, of the state Constitution, vesting legislative authority in the Legislature, because it delegates to the Board of Agriculture power to prescribe the details of the inspection and tests and the standard to which the oils must conform.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 48, 49, 52, 53; Dec. Dig. § 51;* Constitutional Law, Cent. Dig. §§ 94–102; Dec. Dig. § 62.*]

In Equity. In this cause, upon filing the bill, a temporary restraining order, enjoining the enforcement of the provisions of the statute in regard to inspection, but not as to the payment of the tax, was granted, with an order returnable on August 2, 1909, to defendants to show cause why an injunction should not be granted to the hearing.

Aycock & Winston, for complainant.

R. H. Battle & Son and T. W. Bickett, Atty. Gen., for defendants.

CONNOR, District Judge. Complainant seeks to enjoin the enforcement of the provisions of an act of the General Assembly of North Carolina entitled "An act to provide for the inspection of illuminating oils and other fluids," ratified March 8, 1909. Laws 1909, p. 911, c. 554. The act provides:

"Section 1. That all kerosene, or other illuminating oils, sold or offered for sale in this state, shall be subject to inspection and test to determine the safety and value for illuminating purposes."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

All manufacturers, wholesalers and jobbers before selling or offering for sale, in this state, any kerosene, or other oil, for illuminating purposes, are required to file with the Commissioner of Agriculture a statement, showing that they desire to do business in the state, and to furnish the name or brand of the oil, or oils, which they desire to sell, with the names and address of the manufacturer, and that such oil will comply with the requirements of the law.

Sec. 2. Power is conferred upon the Commissioner of Agriculture to collect samples of any illuminating oil offered for sale in this state and have the same analyzed. The inspection of oil, as authorized by the act, is to be made under the direction of the Board of Agriculture, which is authorized—

"to make all necessary rules and regulations for the inspection of such oil and to adopt standards of safety, purity or absence from objectionable substances and luminosity when not in conflict with this act and which they may deem necessary to provide the people of the state with satisfactory illuminating oil."

The Board of Agriculture is required to appoint oil inspectors, not exceeding, in number, one from each congressional district, whose compensation shall not exceed $1,000 a year and expenses. They are given power to examine all barrels, tanks, or other vessels containing kerosene or other illuminating oils to see that they are properly tagged, and shall, as directed, collect and test samples of oil offered for sale in different sections of the state, and, when instructed, collect and send samples to the Department of Agriculture for examination.

Section 3:

"For the purpose of defraying the expenses connected with the inspection, testing and analyzing oils in this state there shall be paid to the Commissioner a charge of one half cent per gallon which payment shall be made before delivery to agents, dealers or consumers in this state."

Provision is made for attaching to each barrel, tank, tank car, and other containers a tag or a stamp to be furnished by the Commissioner of Agriculture showing that the tax has been paid. When oil is shipped in tank cars or other large containers, the manufacturer or jobber shall give notice to the Commissioner of Agriculture of every shipment, with the name and address of the person, company or corporation to whom it is sent, and the number of gallons, on the day the shipment is made.

Section 4:

"All moneys received under the provisions of this act shall be paid into the state treasury and kept as a distinct fund to be styled 'The Oil Inspection Fund.' All checks or orders in payment for tags or stamps shall be made payable to the State Treasurer. The Commissioner of Agriculture is authorized to draw out of said fund, upon his warrant, such sums as may be necessary to pay all expenses incurred in connection with this act including salary to oil chemist, or chemists, cost of inspection, blanks," etc.

Section 5:

"The State Treasurer shall, on the first day of June and December of each year turn into the general fund of the state all moneys of the oil fund in his hands in excess of the amount drawn out by the Commissioner of Agriculture for expenses."

Section 6: The Commissioner of Agriculture is required to include in his report to the General Assembly an account of the operations and expenses under the act.

Section 7 provides that, whenever complaint is made to the Department of Agriculture in regard to the illuminating qualities of any oil sold in this state, the Commissioner shall cause a sample of said oil or oils complained of to be procured, and have the same thoroughly analyzed and tested as to safety and illuminating qualities. If such analysis or other tests shall show that the oil is either unsafe or of inferior illuminating quality, its sale shall be forbidden, and report of the result or results shall be sent to the party making the complaint and to the manufacturer of such oil.

The remaining sections prescribe penalties for violation of the provisions of the law. The act went into effect July 1, 1909. On the 9th day of March, 1909, the General Assembly passed an act entitled:

"An act to suspend the collection of taxes under section 58 of the revenue act because of the higher taxes imposed by the oil inspection act which was ratified on the 8th day of March, 1909." Laws 1909, p. 742, c. 441.

This act contained the following preamble:

"Whereas, since the passage and ratification of the act to raise revenue at the present Session of the General Assembly, a law has been passed providing for the inspection of illuminating oils and for the imposition of an inspection tax of one half cent per gallon thereof; and whereas the said tax is much greater than the tax imposed under section 58 of the revenue act; and whereas it is not the purpose of the General Assembly that the said taxes shall be cumulative: Now therefore: It is enacted, That the tax imposed under section 58 of the revenue act be suspended and not collected from any person, dealer or corporation paying the tax imposed under the inspection law."

This act contains a proviso that, if the inspection act should be held invalid, section 58 should remain in full force and effect. It is alleged that, under a similar provision in the revenue law in force prior to 1909, the tax levied upon oil companies, confined to such as sold more than $25,000 in value of oil, yielded about $10,000 annually. The complainant did not sell a sufficient quantity of oil in this state to subject it to the provision of this act.

Pursuant to the provisions of the act, the Board of Agriculture prescribed a form of "A Statement" to be filed by every person, company, or corporation desiring to sell, or offer for sale, illuminating oil in this state, setting forth the name or brand of oil, flash test, by whom manufactured, a stipulation that the oil or oils sold shall comply with the requirements of the act and regulations of the Board of Agriculture. The board adopted the following rules:

"There shall be placed upon each tank car, vessel, barrel or other container of illuminating oil, offered for sale in this state, the name under which it is sold, the name of the manufacturer or wholesale dealer, flash test of said oil, date when filled; and when a barrel or other container is filled from a tank car, or other large container, the number of said tank car, or other large container; also tax stamp as required by section 3, c. 554, Laws of 1909.

"The flash test of illuminating oils shall not be less than one hundred and five (105) Fahrenheit, as tested by the Elliott method, according to directions prepared by the state chemist."

Shipments by car loads of oil in barrels or vessels or other small containers shall be reported to the commissioner, as required for ship-

ment in tank cars or other large containers by section 4 of the act. The oil chemist is required to analyze such samples as are deemed necessary to ascertain purity and luminosity and report to the Board of Agriculture. The board elected 10 oil inspectors for a term of one year. Each inspector is required to examine all tanks, cars, barrels, vessels, cans, or other containers found in his district to see that they are properly tagged, and to collect samples as directed, and send same to the department for analysis by the oil chemist. The compensation of each inspector is fixed at $3 per day and actual expenses while at work. "All kerosene, or other oils usually used for illuminating purposes offered for sale or sold in this state for other use, shall have plainly marked on the container in letters at least two inches long, or plainly printed on a tag attached thereto: 'Not for illuminating purposes—Dangerous.' Such oil is not subject to inspection." Using or selling it for illuminating purposes is declared to be a violation of section 8 of the act. "The Commissioner, with the approval of the oil committee, may suspend or change any of the regulations, until the ensuing meeting of the board."

The complainant alleges: That it is a corporation duly created and organized under the General Laws of the state of Maryland, authorized to purchase, sell, and otherwise dispose of petroleum and the by-products thereof in the state of Maryland and elsewhere in the United States. That, pursuant to its corporate powers, it is and has been for several years engaged in buying and selling petroleum oil and the products and by-products thereof in the state of North Carolina and other states. That for the purpose of conducting its trade and business in said state it is engaged in shipping over the railroads and other transportation lines extending from the state of Maryland and other states into North Carolina large quantities of illuminating oil and other products and by-products of petroleum. That it has been for several years engaged in the manufacture of kerosene oil for illuminating purposes in the state of Maryland, and shipping and selling the same in North Carolina, and intends to continue to manufacture and ship oil and other products of petroleum into the state of North Carolina to meet the demand of its present and increasing trade. That it has invested in its business and plant—building, machinery, and material—a large capital, exceeding $100,000. Complainant further alleges: That the Commissioner of Agriculture, pursuant to the power vested in him by the said act of the General Assembly and the rules and regulations made by the defendant Board of Agriculture, threatens to enforce the provisions of said act, unless it complies therewith by paying the tax imposed and otherwise obeying and complying with said rules, etc. That he threatens to institute prosecutions against complainant, its agents, and servants for the recovery of the penalties and to declare the forfeitures prescribed in said act for a failure to comply therewith. That, unless restrained by the court, the Commissioner will proceed to enforce said act and the rules and regulations, thereby subjecting complainant to a multiplicity of suits, seriously interfering with its business and otherwise subjecting it to irreparable injury. Complainant alleges that the said act in many respects, all of which are fully set forth, violates the provisions of the Constitution

of the United States and the fourteenth amendment thereto, in that: Kerosene oil, as now manufactured and sold, is not a proper subject of inspection, that it is not in its use dangerous to life or property, and that it is impossible by any practical test, otherwise than by use, to ascertain its illuminating power. That, not being a proper subject of inspection under the police power vested in the state, the attempt to subject it to such inspection and to impose an inspection tax is an interference with interstate commerce, and is oppressive and injurious to complainant. That the act itself, and especially the rules and regulations adopted by the Board of Agriculture, are unreasonable, unjust, and deprive the complainant of its rights, privileges, and immunities secured to it by the Constitution of the United States and the amendments thereto. That the standard of safety fixed by the board is unreasonably high, and the method of testing the oil is unscientific and impracticable. That the rules and regulations prescribed for administering the law unjustly discriminate against complainant and other independent dealers, and give to the Standard Oil Company unfair and unjust advantages in the sale of oil in this state. That the tax of one-half cent per gallon is largely in excess of the cost of inspection, and that, as appears from the language of the act, the history of its enactment, and extrinsic evidence introduced by complainant, it is shown that it was not intended and is not in fact an inspection law, but was intended by the Legislature to be, and is, a measure for raising revenue, violating article 1, § 8, and article 1, § 10, of the Constitution of the United States. That the statute violates the Constitution of North Carolina (article 2, § 1), in that it confers upon the Board of Agriculture legislative power. The defendants deny each and every one of the allegations, upon the truth of which the prayer for relief is based.

The disposition of the first contention involves an inquiry respecting the character, extent of, and limitations upon the police power, as it is related to, or affected by, the power conferred upon Congress to regulate interstate commerce. It was held in the Slaughterhouse Cases, 16 Wall. 36, 21 L. Ed. 394, "that the fourteenth amendment did not interfere with the exercise of the police power by the states." Guthrie's Fourteenth Amendment, 77. It is conceded that all of the kerosene oil sold and used in this state is manufactured, or is the product of crude petroleum brought in from other states. It is conceded that, unless the inspection of illuminating oils can be sustained as a valid exercise of the police power, it violates article 1, § 8, of the federal Constitution. It therefore becomes necessary to dispose of that question at the threshold of the discussion. No question of discrimination is presented. While it is not easy to define and fix the limits upon the police power, it is sufficient for the purpose of this discussion to say that:

"It includes the power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity originally and always belonging to the states not surrendered by them to the general government, nor directly restrained by the Constitution of the United States." Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.

Mr. Justice Day in McLean v. Denver & Rio Grande R. R., 203 U S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78, after referring to the constitutional provision conferring upon Congress the exclusive power to regulate interstate commerce, says:

"While this is true, it is equally well settled that a state or territory for the same reasons in the exercise of the police power may make rules and reg- ulations, not conflicting with the legislation of Congress upon the same subject, and not amounting to regulations of interstate commerce. * * * A state or territory has the right to legislate for the safety and welfare of its people, and this right is not taken from it because of the exclusive right of Congress to regulate interstate commerce, except in cases where the attempted exercise of authority by the Legislature is in conflict with an act of Congress or is an at- tempt to regulate interstate commerce."

It is not suggested that Congress has legislated upon the subject. In Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 18 Sup. Ct. 862, 43 L. Ed. 191, it is held that:

"Whenever inspection laws act on a subject, before it becomes an article of commerce, they are confessedly valid, and also when, although operating on articles brought from one state into another, they provide for inspection in the exercise of that power of self-protection, commonly called the police power. No doubt can be entertained of this when the inspection is manifestly intended and calculated in good faith to protect the public health, the public morals, or the public safety. And it has now been determined that this is so if the ob- ject of the inspection is the prevention of imposition on the public generally."

Mr. Guthrie as the result of a careful examination of the decided cases thus states the limitations on the police power:

"In considering the validity of an enactment of a state Legislature under the police power, the inquiry is whether the regulation or classification has been designed to subserve some reasonable public purpose, or is a mere device or excuse for an unjust discrimination or for the oppression or spoliation of a particular class. Any regulation of the internal affairs of the state fairly sub- serving a valid police purpose and reasonably exercised for the benefit of the community at large will be upheld, but, if it be arbitrary and have no sub- stantial relation to the health, morals, peace, or welfare of the community, it will be nullified. No precise limits, however, should be placed upon the police power of the state, for no one can foresee what regulations the welfare of the community may require." Fourteenth Amendment 74, 75; Hawker v. New York, 170 U. S. 192, 18 Sup. Ct. 575, 42 L. Ed. 1002.

In Patapsco Guano Co. v. Board of Agriculture, supra, the court sustained an act providing for the inspection of commercial fertilizers sold or shipped into the state. Mr. Chief Justice Fuller said:

"Inspection laws are not in themselves regulations of commerce, and, while their object frequently is to improve the quality of articles produced by the labor of a country and fit them for exportation, yet they are quite as often aimed at fitting them, or determining their fitness, for domestic use, and in so doing protecting the citizen from fraud. Necessarily in the latter aspect such laws are applicable to articles imported into as well as articles produced with- in a state."

In Asbell v. Kansas, 209 U. S. 251, 28 Sup. Ct. 485, 52 L. Ed. 778, discussing an act requiring the inspection of cattle brought into the state, Mr. Justice Moody said:

"The statute before us is an inspection law and nothing else. It excludes only cattle found to be diseased, and, in the absence of controlling legislation by Congress, it is clearly within the authority of the state, even though it may have an incidental and indirect effect upon commerce between the states."

Mr. Justice Day in McLean v. Denver & Rio Grande R. R., supra, discussing the same question in regard to a law providing for the inspection of hides, says:

"It is true that it affects interstate commerce, but we do not think such was its primary purpose, and, while it may have an effect upon this class of property, the main purpose evidently was to protect the people against fraud and wrong."

In Oil Co. v. Craine, 209 U. S. 211, 28 Sup. Ct. 475, 52 L. Ed. 754, it appeared that the oil inspection law of Tennessee imposed an inspection tax upon oil brought into the state and stored for shipment to other states. The oil company, insisting that such oil was the subject of interstate commerce, sought to enjoin the collection of the tax. While the questions presented in this case were not discussed or decided in the opinion, many of the reasons here assigned for attacking it were pressed by counsel in the brief filed in that case. The act was sustained. There is no suggestion in the opinion that it was not valid as a police regulation. The power of the state to enforce inspection laws in the exercise of the police power is discussed in Plumley v. Mass., 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, and Schollenberger v. Penna., 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49, wherein restrictive legislation in regard to the introduction and sale of oleomargarine was involved. In Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159, 29 Sup. Ct. 270, 53 L. Ed. 453, the Oklahoma oil inspection law was attacked. Mr. Justice White said:

"We think the court below was clearly right in deciding that, as the subject was within the police power of the state, it was not within the province of the judiciary to disregard the statute and treat it as void upon the theory that the Legislature had acted unwisely in fixing the standard which the statute prescribed."

Complainant insists that if it be conceded that, under conditions formerly existing, kerosene oil, by reason of the explosive fluids, naptha and gasoline, left in it, when offered for sale, at the present time such conditions do not exist, that they are so completely eliminated from the oil that there is no danger of explosion. In support of this contention it alleges in the bill and reads affidavits made by persons having scientific knowledge, training, and experience to show that formerly the value of naptha and gasoline was very small, not so great as the kerosene oil; that now, and for some time past, their value has increased very much and is much greater than the oil; that refiners now take all of the naptha out of the crude petroleum by a process which is explained in the affidavits; that, by reason of this condition, the danger to life and property from explosion of illuminating oil or vapors generated in its use "has been reduced to a minimum, and there is at this time no danger whatever from the use of kerosene oil." Defendants say that, while "it is true that a part of the explosive product and by-products of crude petroleum are of greater commercial value than kerosene or other illuminating oil, they aver that there is enough explosive substance left in the oil to make it dangerous to life and property, and this is shown by the fact that the more progressive and intelligent states in the Union have upon their statute books oil inspection laws similar to the law of North Carolina." Defendants

read in support of their contention the affidavits of the state oil chemist and of Dr. Withers, the professor of Chemistry at the State Agricultural and Mechanical College, who say that they have made a study of the subject, and have had training and experience in analyzing and testing illuminating oils. They give it as their opinion and that of other eminent chemists, whose writings they quote, that the illuminating oil sold in the markets of this state is sometimes dangerous. Prof. Withers says:

"Affiant has tested samples furnished by the state oil chemist from oils on sale in this state, and has found some which showed a flash point of less than 90 degrees F. by the Elliott closed cup and less than 100 degrees F. by the Tagliabue cup and the Foster cup. He is of the opinion that the use of such oil in lamps for illuminating purposes is dangerous and should not be permitted."

He is "also of the opinion that the State Board of Agriculture should require the state oil chemist to make tests which will show the light giving qualities of the illuminating oils on sale in this state. These tests may be made by the use of a photometer. There are other tests which may be made which will indicate the light giving power." Prof. Syme says that he has visited the states of Georgia, Tennessee, and Ohio, the Bureau of Combustibles of New York City, and Bureau of Chemistry of the United States Department of Agriculture at Washington, and has investigated the systems of oil inspection and standards in use in those places; that in the light of the information he has acquired by the study of illuminating oils he has recommended to the Board of Agriculture the adoption of a flash test of not less than 100 degree Fahrenheit made with the New York state board of health tester, commonly called the "Elliott cup," or the Standard Flash, for insuring the safety in the use of oils. He also gives it as his opinion that the standard adopted by the board is as low as it should be in this climate. It appears from the affidavits and exhibits that in 35 states of the Union, including the state of Maryland, oil inspection laws are in force; that in almost, if not quite, all the countries of Europe and in Canada, New Zealand, Australia, and Japan similar laws are in force. The standards and methods of testing the oils vary. The Elliott cup is used in only five states in the Union. Assuming that, under ordinary conditions, kerosene oil is a proper subject for the operation of the inspection laws, not conflicting with the right of Congress to regulate interstate commerce, has complainant shown that, by reason of the condition alleged to exist, the naptha and gasoline in crude petroleum are so thoroughly and perfectly eliminated by distillation, refinement, or other process as to render the oil harmless and remove it from the domain of such legislation by the state in the exercise of the police power? It is well settled that, while the power to enact such laws and to say what articles of commerce shall be brought within their provisions is primarily vested in the Legislature, the ultimate decision of the question whether in a given case the sale or use of the article bears any reasonable relation to the public morals, health, or safety is vested in the courts. "The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed under a solemn duty—to look at the substance of things

whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and give effect to the Constitution." Mugler v. Kansas, 123 U. S. 661, 8 Sup. Ct. 297, 31 L. Ed. 205, and Minn. v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455. Whether in passing a statute in the exercise of the police power the Legislature has exceeded its constitutional limitations and deprived the citizen of his constitutional right is of necessity a judicial question. If it were not so, constitutional limitations would be of no validity; the legislative will, not the Constitution, would be "the supreme law of the land." This is elementary and has long since passed beyond the domain of debate. It is equally elementary and equally essential to the practical working of a government of defined, distributed powers that:

"In determining whether the Legislature in a particular enactment has exceeded the limits of its constitutional authority, every reasonable presumption must be indulged in favor of the validity of such enactment. It must be regarded as valid unless it can be clearly shown to be in conflict with the Constitution. It is a well-settled rule of constitutional exposition that, if a statute may or may not be according to circumstances within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed." Harlan, J., in Sweet v. Rechel, 159 U. S. 380, 16 Sup. Ct. 43, 40 L. Ed. 188.

The latest expression of the Supreme Court is from Mr. Justice Moody in Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. The city of Knoxville fixed rates to be charged by the water company. Claiming that they were confiscatory, the company applied to the Circuit Court for an injunction restraining their enforcement. The learned justice said:

"There can at this day be no doubt that the courts on constitutional grounds may exercise the power of refusing to enforce legislation, nor, on the other hand, that the power ought to be exercised only in the clearest cases. The constitutional invalidity should be manifest, and, when that invalidity rests upon disputed questions of fact, the invalidating facts must be proven to the satisfaction of the court. * * * Nothing less than this is demanded by the respect due from the judicial to the legislative authority."

Mr. Justice Peckham in Wilcox v. Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, in which the validity of rates was brought into question, said:

"The case must be a clear one before the court ought to be asked to interfere with state legislation upon the subject of rates, especially before there has been any actual experience of the practical results of such rates."

Mr. Justice Harlan in Plumley v. Mass., supra, said:

"The judiciary of the United States should not strike down a legislative enactment of a state, especially if it has direct connection with the social order, the health, and the morals of the people, unless such legislation plainly and palpably violates some right granted or secured to the national Constitution or encroaches upon the authority delegated to the United States for the attainment of objects of national concern."

In considering this aspect of the bill the allegations in regard to the "Rules and Regulations" adopted by the Board of Agriculture—the standard of safety—the instrument and method adopted for testing the oils and their effect upon complainant's constitutional rights are treated as part of the act. Complaint is made of the standard. It is said that it is unreasonably high; that it will be very difficult for independent companies to procure the oil necessary to meet the regulations and requirements of the board; that they may result in driving them out of the state, thus giving to the Standard Oil Company a monopoly in the sale of oil in the state; that, in order to furnish oil to the consumers in North Carolina under the rules and regulations prescribed, the oil will cost them a much higher price, probably as much as five cents a gallon more than is now charged, which will entail an expense of $500,000 upon the people. It is sufficient to say that no one or all of these matters can' affect the decision of the question whether the statute, together with the rules and regulations, as applied to the conditions existing in this state, is within the legislative police power. If, as it alleges, the standard of safety fixed is unreasonably high, or the method of testing the oil unsatisfactory and not such as are in general use or the regulations in other respects unjust or oppressive, it should seek relief by applying to the Board of Agriculture to modify them. The court cannot declare a law invalid because in its opinion it does not accord with sound policy or justice. The appeal for redress must be made to the lawmaking power. "The courts have no responsibility for the justice or wisdom of legislation, and no duty except to enforce the law as it is written, unless it is clearly beyond the constitutional power of the lawmaking body." St. Louis & Iron Mt. Ry. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061. It is not claimed that the rules and regulations are prohibitory. If their enforcement will add very largely to the cost of the oil to be paid by the consumer, this does not affect any constitutional right of complainant. While there is much diversity of opinion in respect to the danger of explosion from the use of kerosene oil and of the power to ascertain its illuminating capacity, it is evident that the question has not so far passed beyond the domain of debate that the Legislature may not subject it to reasonable inspection before permitting its sale in the state. The court cannot say that such a law has no reasonable relation to the public safety or welfare. In its domicile of origin and of residence complainant's product is subjected to an inspection law fixing standards and tests, differing, it is true, from those established in this state. A careful analysis of the act and rules and regulations established for its administration shows that it conforms to the standard fixed by the courts for the validity of such legislation. "The particular exercise of the police power must tend, in a degree that is perceptible, to secure some object of the proper exercise of the police power, and the court must be able to see that the means adopted have a reasonable relation to the end desired." Health Dept., etc., v. Trustees, etc., 145 N. Y. 39, 39 N. E. 835, 27 L. R. A. 710, 45 Am. St. Rep. 579. This being so, the act does not upon its face conflict with the right of Congress to regulate interstate commerce or

deprive the complainant of any constitutional right or privilege, or take its property without due process of law.

The complainant further says that the act violates the Constitution because it imposes an excise or impost tax upon oil shipped into the state. Article 1, § 10, provides:

"That no state shall, without the consent of Congress, lay any impost or duty, on any imports or exports, except what may be absolutely necessary for executing its inspection laws."

The terms "imports" and "exports," as used in this section, have been held to refer to such articles as are brought into or sent out of the states from or to foreign countries. Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Woodruff v. Parham, 75 U. S. 123, 19 L. Ed. 382. In Pittsburg Coal Co. v. Louisiana, 156 U. S. 590, 15 Sup. Ct. 459, 39 L. Ed. 544, it is said:

"The terms 'imports' and 'exports' apply only to articles imported from foreign countries, or exported to them. The inhibition imposed is the laying of duties on imports from foreign countries and not on such as come from one state to another."

While no express prohibition is found in the Constitution against a state laying such duty or tax upon an article brought into its borders from a sister state, of necessity it is found in the power conferred upon Congress to regulate interstate commerce, because, as said by Judge Marshall, "the power to tax is the power to destroy." While, therefore, the state may not tax interstate commerce, it may, in the exercise of its reserved police power, impose such a reasonable charge or tax as is necessary to execute its inspection laws. It is said by Mr. Justice Bradley in Neilson v. Garza, 2 Woods, 287, Fed. Cas. No. 10,091:

"The right to make inspection laws is not granted to Congress, but is reserved to the states; but it is subject to the paramount right of Congress to regulate commerce with foreign nations and among the states, and if any state, as a means of carrying out and executing its inspection laws, imposes any duty or impost on imports or exports, such duty is void, if it exceeds what is absolutely necessary for executing such inspection laws."

This case is cited, and the language quoted with approval, in Patapsco Guano Co. v. Board of Agriculture, supra. Thus the limitation upon the amount of a tax imposed by an inspection law upon an article which is the subject of interstate commerce is the same as that fixed by the Constitution in article 1, § 10, upon "imports." If an excessive inspection tax is imposed upon an "import" within the meaning of that section, it is provided that:

"The net produce of all duties and imposts laid by any state on imports or exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of the Congress."

No such provision being found in section 8, the inhibition can be enforced only by declaring the statute imposing the tax invalid. In the Neilson Case, Judge Bradley inquires how the alleged excess is to be determined. After suggesting the difficulties involved in submitting the question to a jury, he concludes:

"Then we are brought back to the question whether the law is really an inspection law. If it is, we cannot interfere with it on account of supposed ex-

cessiveness of fees. If it is not, the exaction is clearly unconstitutional and void, being an unauthorized interference with free importation of goods."

In the Patapsco Guano Case, supra, it appears that the Legislature passed an act imposing a "license tax of $500" upon dealers in commercial fertilizers, on each separate brand sold, and expressly appropriated large sums, from the proceeds of the tax, to specific objects, the support of an industrial association, the expense of an oyster survey, and the establishment of an agricultural college. The act was declared invalid. Fertilizer Co. v. Board of Agriculture (C. C.) 43 Fed. 609, 11 L. R. A. 179, Seymour, J., delivering the opinion. He said that, while the court might judicially take notice of the fact that the amount of the tax was largely in excess of the cost of inspection, it was relieved of "all embarrassment in this respect by the fact that the act declares by necessary implication that the tax is not needed for inspection expenses." In consequence of this decision, the Legislature repealed the invalidating provisions of the act, and enacted a statute practically the same as section 3955 of the Revisal of 1905 (section 2190, Code 1883), providing that:

"For the purpose of defraying the expenses connected with the inspection of fertilizers and fertilizing material in this state, there shall be paid to the Commissioner of Agriculture a charge of twenty-five (now twenty) cents per ton on such fertilizers."

The proceeds of this tax are directed to be paid into the state treasury by the Commissioner of Agriculture, and kept on a separate account by the Treasurer as a fund for the exclusive use and benefit of the Department of Agriculture. Revisal 1905, § 3937 (Code 1883, § 2208). This act was sustained in an opinion by Seymour, J., in Patapsco Guano Co. v. Board of Agriculture (C. C.) 52 Fed. 690. Upon appeal the judgment was affirmed, Fuller, C. J., saying that the alleged excessiveness of the tax was only material if "it demonstrates a purpose other than that which the law declared." In discussing the same objection to an inspection law in McLean v. Denver & Rio Grande R. R., supra, it is said:

"It is further urged that this law is invalid because it imposes an unreasonable fee for the inspection which goes into the treasury of the sanitary board. * * * The law being otherwise valid, the amount of the inspection fee is not a judicial question. It rests with the Legislature to fix the amount, and it can only present a valid objection when it is shown that it is so unreasonable and disproportionate to the service rendered as to attack the good faith of the law."

The sole ground, therefore, upon which the amount of the inspection tax becomes material, or can be considered by the court, is to ascertain whether the Legislature has acted in good faith—has enacted a statute for the purpose of securing inspection of illuminating oil sold to the people, or whether, under the guise of doing so, it has violated the Constitution and imposed a tax for the purpose of increasing the revenues of the state. In no other aspect is the amount of the tax as related to the cost of inspection "a judicial question." Before the court should find in the language or in the provisions of a statute a purpose on the part of the Legislature to violate the Constitution and to nullify the statute otherwise clearly within its power to enact, such un-

constitutional purpose should appear beyond any reasonable doubt. The court will never presume that the Legislature intended to violate the Constitution. In the language of Mr. Justice Moody: "Nothing less than this is demanded by the respect due from the judicial to the legislative authority." It will be well to inquire in what manner the Supreme Court has dealt with the question in similar cases. In the Patapsco Guano Case, supra, Chief Justice Fuller said:

"If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the Legislature would moderate the charge. But, treating the question whether the charge of 25 cents per ton was shown to be so excessive as to demonstrate a purpose other than that which the law declared as a judicial question, we are satisfied that, comparing the receipts from this charge with the necessary expenses, such as the cost of analyses, the salaries of inspectors, the cost of tags, express charges, miscellaneous expenses of the department in this connection, and so on, we cannot conclude that the charge is so seriously in excess of what is necessary for the objects designed to be affected as to justify the imputation of bad faith and change the character of the act."

In Western Union Telegraph Co. v. New Hope, 187 U. S. 419, 23 Sup. Ct. 204, 47 L. Ed. 240, it appeared that the borough had imposed a license tax to meet the expense of inspection and supervision upon the poles and wires of the telegraph, telephone, and electric light companies. In an action to enforce the payment of the tax the company contended, as here, that the tax was so largely in excess of the cost of inspection and supervision as to show that such was not its real purpose, but that it was intended and had the effect of bringing revenue into the treasury. Upon appeal Mr. Chief Justice Fuller said:

"It is conceded that the borough had the right, in the exercise of its police power, to impose a reasonable license fee upon telegraph poles within its limits, and that an ordinance imposing such fee is to be taken as prima facie reasonable."

In the discussion a number of decisions of the Supreme Court of Pennsylvania are cited—one in which it was conceded that the tax was five times more than the cost of inspection. The Chief Justice concludes:

"Concurring in these views, in general, we think it would be going much too far for us to decide that the test set up (the annual cost of inspection) by the plaintiff in error must be necessarily applied and the ordinance held void because of failure to meet it." St. Louis v. Telegraph Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380; Id., 149 U. S. 465, 13 Sup. Ct. 990, 37 L. Ed. 810.

The same principle or test was applied in McLean v. Denver & Rio Grande Ry. Co., supra; the court saying:

"The facts shown do not bring the case within that class which holds that, under the guise of inspection, other and different purposes are to be subserved, thus rendering the legislation invalid."

In Telephone Co. v. Taylor, 192 U. S. 64, 24 Sup. Ct. 208, 48 L. Ed. 342, it appeared that a license fee was imposed upon poles and wires to cover cost of inspection and supervision. In an action brought to recover the fee Mr. Justice Peckham said:

"The borough has, in fact, done nothing in the way of inspection or supervision during the time covered by the license in question. It has not expended one dollar for any such purpose. It has incurred no liability to pay any ex-

penses arising from inspection or supervision on its behalf. The fee itself is 20 times the amount of expense that might have been reasonably and fairly incurred to make the most careful, thorough, and efficient inspection and supervision that might have been made of such poles and wires and for all reasonable measures and precautions that possibly could be required to be taken by the borough for the safety of its citizens and the public."

The opinion concludes:

"Judging the intention of the borough by its action, it did not intend to expend anything for the inspection of the poles and wires, and did intend to raise revenue under the ordinance."

This is not the expression of an opinion—it is the averment of a fact.

The distinction between this and the other cases cited is too obvious to require comment. Applying the principle or test upon which all of the decisions go to the facts developed in the record, what is the conclusion? There is nothing on the face of the law to show that the tax will yield an amount largely in excess of the cost of inspection, but the bill alleges it will be more than double the amount necessary for the inspection proposed under the statute and regulations, and that defendants estimate that they will be able to turn into the state treasury annually, after paying all of the expenses, at least $20,000. This is denied by the defendants. The only evidence offered to sustain the averment is the affidavit of the president of complainant in which he says:

"The present act, if enforced, and if as much oil is sold under said act as has heretofore been sold in this state, will produce an income of $52,000 per year, and that the inspection provided for under the rules and regulations of the Department of Agriculture will not necessitate the use of half that sum."

At best this is but the opinion of the president. He does not say what quantity of oil was shipped into the state during the past year, nor does he undertake to, as probably he could not by anticipation, say what the cost of inspection will be. There are many items of expense as enumerated by the court in the Patapsco Guano Case, the character and amount of which cannot be anticipated with any reasonable degree of certainty. It is due the Department of Agriculture to assume that a fair trial will be given, the result reported to the General Assembly, and, as said by the Chief Justice, if the charge is found excessive, it will be "moderated." While the power to enjoin the enforcement of statutes manifestly violative of the Constitution and destructive of the rights of the citizen is clear, it should be exercised with great caution and with due regard to the respect which is due from the judicial to the legislative authority, and to the necessity for arresting the enforcement of the law to prevent irreparable injury. The observations of the court and the course pursued in the case of Knoxville v. Water Co., supra, express clearly the best considered view of the Supreme Court upon this subject. It is an elementary doctrine of equity jurisprudence that an injunction will not be granted, unless the facts upon which the extraordinary relief is demanded are clearly set forth and sustained. Mere opinion or apprehension of injury are not sufficient. "A preliminary injunction proceeding on the ground of the invalidity of a statute will not be granted unless it is quite clear that the statute cannot stand or that there is great danger of irreparable injury."

Ryan v. Williams (C. C.) 100 Fed. 177. Any other rule of practice would invite frequent applications to the courts to enjoin the enforcement of statutes before they had gone into operation, based upon more or less well-grounded apprehensions of irreparable injury, resulting in serious disturbance of the relations between the different departments of the government, and entailing other evils which a due regard to elementary principles would prevent. It appears from an examination of the various oil inspection laws in force in the United States that the charges for inspection vary from one-half to one and one-half cents per gallon, and that in states wherein population and other conditions are similar to those in this state the charge is about the same as that fixed by the act. The fact that the statute directs that semiannually the balance to the credit of the oil inspection fund is to be turned into the general fund does not show that there will be any surplus. It does tend to show that the Legislature anticipated that there might be, but experience has demonstrated that an anticipated revenue surplus too frequently exists only in the legislative mind. It is insisted that the passage of the act of March 9, 1909, suspending the tax imposed upon dealers in oil under section 58 of the revenue law (Laws 1909, p. 674, c. 438), shows that the Legislature intended and expected the act to produce revenue. The recitals and preamble to that act throw but little light upon this question. It is manifest that the cost of inspection will greatly exceed the amount raised by section 58, estimated at $10,-000. It is equally manifest that the Legislature expected the inspection tax to cover the cost of inspection; hence the recital is entirely consistent with the declaration that the oil inspection law would yield a much larger sum than section 58 of the revenue law. It might well be that the Legislature did not deem it wise to impose a cumulative tax upon illuminating oil, especially in view of the elementary truth that the consumer pays the tax, and that in consideration of the benefit secured to the people by an inspection of oil used by them the state was willing to surrender a revenue collected under section 58. Whatever may have been in the legislative mind, the passage of the act of March 9th is far from conclusive evidence of a purpose to violate the Constitution or act in bad faith in the passage of the oil inspection law, and it has no relevancy to the argument for any other purpose.

The complainant insists that its contention in this respect is sustained (1) by the report made by the minority of the committee recommending the passage of the bill, saying that "many of the states not only protect the people in the matter of lights, but receive considerable revenue from the inspection," naming two states; (2) that two members of the house in advocating the passage of the bill stated that it would yield considerable revenue, one of them estimating $30,000; that one member who opposed the bill urged the same opinion as his reason for thinking that it was unconstitutional. This is stated in the affidavit of the president of complainant, and taken as true. He also says that he is informed and believes that "like positions were taken in the other branch of the General Assembly." In Aldridge v. Williams, 3 How. 9, 11 L. Ed. 469, Taney, C. J., said:

"The judgment of the court cannot in any degree be influenced by the construction placed by individual members of Congress in the debate which took

place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both Houses, and the only mode in which that will is spoken is the act itself; and we must gather their intention from the language used, comparing it when any ambiguity exists with the law upon the same subject, and looking, if necessary, to the public history of the time at which it was passed."

In U. S. v. Freight Ass'n, 166 U. S. 290, 318, 17 Sup. Ct. 540, 550, 41 L. Ed. 1007, the reason of the rule is clearly stated, and its wisdom strongly illustrated:

"It is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of the individual members thereof. Those who did not speak may not have agreed with those who did, and those who spoke might differ from each other, the result being that the only way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed."

It would but invite a court into a most uncertain and unsatisfactory domain of conjecture to abandon the language of a statute, the meaning of which is free from doubt, to indulge in speculation as to the motives of the members of a legislative body in voting for or against it. To do so would endanger the integrity of the statute law of the state. A careful consideration of the record, in the light of well-settled principles of constitutional exposition and well-considered authorities, fails to show that the court should find that the law was not passed in good faith for the purpose explicitly declared both in its title and in its provisions. As shown, this is the test upon which its validity depends.

The last assault made upon the act, and strongly urged in the argument, is that it is incomplete, indefinite, and dependent for its validity and enforcement upon the exercise of legislative power conferred upon the Board of Agriculture. It is true that the act fixes no other standard than that the oil shall be satisfactory in respect to safety and illuminating power, nor does it prescribe any method of testing it for the purpose of ascertaining whether it conforms to the standard in these respects. Power is conferred upon the Board of Agriculture "to make all necessary rules and regulations for the inspection of such oil and to adopt standards of safety and purity." It is said that, until this legislative power is exercised, the act is incapable of enforcement, that it is a mere legislative declaration of a purpose to subject oil to inspection giving the manufacturer no notice of the standard to which its oil must conform, nor the consumer of what he has a right to demand. This power, it is urged, is vested exclusively in the Legislature, and cannot be delegated. Article 2, § 1, of the State Constitution, provides that "the legislative authority shall be vested in two distinct branches both dependent on the people," and section 8, art. 1, declares that the legislative, executive, and supreme judicial powers ought to be kept forever separate and distinct. There is nothing in the federal Constitution which prohibits the Legislature of a state from delegating legislative power. In Dreyer v. Illinois, 187 U. S. 71, 84, 23 Sup. Ct. 28, 32, 17 L. Ed. 79, it is said:

"Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the state. And its determination, one way or another, cannot be an element in the inquiry whether due process of law prescribed by the fourteenth amendment has been respected by the state or its representatives when dealing with matters of life or liberty." Prentis v. A. C. L. R. R. Co., 211 U. S. 210, 225, 29 Sup. Ct. 67, 69, 53 L. Ed. 150.

It is insisted that the court having jurisdiction of the cause by reason of the diverse citizenship of the parties must pass upon this question. The courts of this state have uniformly adhered and given full force and effect to this essentially fundamental principle which separates the function of the three co-ordinate departments of the government. They have also recognized the practical difficulty of carrying into effect the well-settled policy of the state to secure police regulation and protection in regard to many subjects except by the use of commissions and other quasi legislative and administrative boards. They have with practical uniformity sustained statutes, the provisions of which verge very closely upon the line of constitutional inhibition in respect to the delegation of legislative power. While, as shown by many strongly reasoned and well-sustained cases cited by counsel to the contrary, decisions of the courts of other states are in accord with ours. It is concededly difficult to reconcile many of the decided cases. It is true, as shown by the briefs, that in all of the other states the oil inspection laws fix the standard of safety. It is also true that the fertilizer and cotton seed meal inspection laws in this state fix the standards of purity and fitness for use. In the light of these statutes the attack made upon the act under consideration in this respect is not without force. Many reasons occur to the mind why the Legislature deemed it best to leave the fixing of standards and methods of testing oil to an intelligent Board of Agriculture with the aid of chemists and other persons having knowledge and experience in such matters. The sole question, however, for the court is whether the act violates the Constitution in this respect. The delegation of power to fix reasonable rates to be charged by common carriers of passengers and freights is found in both federal and state statutes and sustained by the courts with full recognition that it is a legislative power. The same is true in regard to rates charged by telegraph, telephone, water companies, electric light companies, and all other public utilities. It is said that this legislation is sustained because of the necessity of the case— that it is not practicable for the Legislature to fix rates. The answer to this is found in the fact that in our own and many other states the Legislature has fixed such rates and the right to do so sustained by the court. It is said that a standard is fixed by the statutes creating these commissions that the rates are to be "reasonable," so here the oil is to be "satisfactory" in respect to safety and luminosity. Some of the cases cited may be distinguished, and some, although very much in point, it might be shown are not in harmony with the current of authority. The principle upon which this act may be sustained is stated and its applicability illustrated in Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525. Congress enacted a statute prohibiting

the importation of any tea "which is inferior in purity, quality, and fitness for consumption to the standards provided by section 3 of this act." This section provided that the Secretary of the Treasury upon the recommendation of a board appointed by him should "fix and establish uniform standards of purity, quality, and fitness for consumption of all teas," etc. The act was attacked because it delegated to the Secretary of the Treasury and the board appointed by him legislative power to fix the standard of teas imported into the country, etc. It is stated in the exhaustive briefs filed that the case was the last of a series of cases brought to test the constitutionality of the act. Mr. Justice White thus states the contention:

"That the act confers authority to establish standards and that such power is legislative, and cannot constitutionally be delegated by Congress to administrative officers."

He disposes of it by saying:

"The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported and therefore in effect vests that official with legislative power is without merit. We are of the opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity or unfit for consumption, or presumably so, because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. * * * Congress legislated upon the subject as far as was reasonably practicable, and, from the necessities of the case, was compelled to leave to an executive official the duty of bringing about the result pointed out by the statute. * * * The sufficiency of the standards adopted by the Secretary of the Treasury was committed to his judgment to be honestly exercised, and, if that were important, there is no assertion here of bad faith or malice on the part of that officer in fixing the standards, or on the part of the defendant in the performance of the duties resting upon him."

An act of Congress conferring upon the American Railway Association the power to designate to the Interstate Commerce Commission the standard height of drawbars for freight cars, and was sustained upon the authority of the Buttfield Case. It would be difficult to distinguish these cases in principle from this. In Isenhour v. State, 157 Ind. 517, 62 N. E. 40, 87 Am. St. Rep. 228, a pure food law conferring upon the State Board of Health the power to "prepare rules regulating standards," etc., was sustained. See, also, Union Bridge Co. v. U. S., 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; State v. Briggs, 45 Or. 366, 77 Pac. 750, 78 Pac. 361; Lockes' App., 72 Pa. 491, 13 Am. Rep. 716. To deny to the Legislature the power to fix the "primary standard" in respect to many of the multitude of subjects coming within the police power, and vesting in commissions and administrative boards or officers the power to work out the details, would seriously embarrass the state governments in many of their most important functions. As said by the editor of American & English Encyclopedia (volume 6, p. 1022):

"A marked tendency appears in the direction of assigning duties heretofore deemed legislative to other bodies, to boards and commissions, to local authorities, and especially to the voters."

There is a manifest advantage in the course pursued by the Legislature in this enactment. The standards fixed in other states vary, and the oil chemists do not agree as to the methods of inspection. Reasonable changes suggested by experience and larger information may be made by the board. In the Buttfield Case, supra, commenting upon the complaint that the rules and regulations made by the Secretary of the Treasury are harsh or unreasonable, it is said that a hearing should have been sought rather than an application to annul the statute. It does not appear in this record that complainant has requested any hearing or submitted any suggestions in regard to the standard fixed by the board, or the method of testing oil. This course would probably afford relief from any harsh, unjust, or oppressive rule, if such has been made, by the Board of Agriculture. It may be that the attempt to confer upon the Commissioner and the oil committee power to change the rules is invalid. There is no suggestion that this is threatened.

Upon a careful consideration of the several grounds upon which the complainant's prayer for injunctive relief is based, in the light of the enlightening arguments and briefs of counsel, no valid cause is seen for enjoining the defendants from proceeding with the enforcement of the act in accordance with its provisions and the rules and regulations adopted for its administration. As no other relief is asked, the bill will be dismissed at complainant's cost. It is so ordered.